IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Matter of the Estate of: | ) | No. 31915-6-III |
| | ) | |
| ELMA L. HAYES, | ) | |
| Deceased, | ) | PUBLISHED OPINION |
| and | ) | |
| JAMES L. HAYES, | ) | |
| Appellant. | ) | |

FEARING, J. — Brothers James and Jerry Hayes dispute the meaning of their

mother Elma Hayes' will. James Hayes signed a favorable lease with his mother to farm

the family's land. When she died, Elma devised in her will discrete portions of the leased

farmland to each of her four children. The dispute requires a ruling as to whether Elma

intended to partition the lease into four separate agreements when she partitioned the

farmland in her will. James contends she did, such that the lease covering his quarter

share of property was extinguished when he became both the landlord and tenant, and, in

turn, he could sell his land free of the favorable lease. In turn, James claims the lease

continues to encumber his three siblings' leases such that they may not sell their parcels

free of the lease favorable to him.

Jerry Hayes argues the lease remained one agreement covering the entire four quarters in the aggregate even after the four siblings inherited their parcels under their mother's will. If Jerry is correct, James' subsequent sale of his parcel violated the anti-alienation clause in the lease, thereby terminating the lease. Jerry Hayes' interests align with the brothers' other two siblings, John Hayes and Patricia Elder.

The trial court, after discerning the intent of Elma Hayes and noting the favorable terms of the farm lease to the tenant, agreed with Jerry Hayes. In addition to arguing the merits of the dispute on appeal, James Hayes contends the trial court exceeded its jurisdiction, incorrectly excluded testimony, erroneously took judicial notice of rental rates for Lincoln County farmland, and suffered from bias caused by his upbringing on a farm and former representation as a lawyer of grower clients. We affirm.

## FACTS

Lloyd and Elma Hayes, husband and wife, farmed 1,225 acres near Hartline, Washington. The couple raised four children, James, John, Patricia, and Jerry.

In March 1991, Lloyd Hayes died. In that crop year, the farm suffered its third crop failure in five years. In 1992, the farm suffered another bad year such that the farm had accrued $123,000 of debt. The yoke of this financial burden led matriarch Elma Hayes to convene a family meeting.

In 1992, James, Patricia, and John met with their mother at the farm home to

2

discuss retirement of the significant debt. Jerry, who lived out of state, did not attend the conference but told his family that he would concur in any decision. James proposed selling the farm. Elma, however, preferred that one of the three boys work the farm and assume the debt. John declined. Jerry later expressed no interest in undertaking farming operations. James reluctantly accepted farm responsibilities and its debt.

As an incentive to work the farm and pay the debt, Elma Hayes leased the 1,225 acres to James for five dollars an acre for 25 years. James accepted the lease because it provided him a decent living until he retired at age 65 and afforded him 25 years to service the debt.

Jerry Hayes describes the farm lease as a "sweetheart deal." Clerk's Papers (CP) at 317. A tenant usually pays rent for dryland wheat property in eastern Grant County under a crop share arrangement. The landlord receives one-third of the crop, shares one-third of certain expenses, and pays all property taxes. Jerry calculated the return that the landlord would have received under a crop share basis and concluded that his brother James paid one-fifth of the market rate as rent for the Hartline farmland. Through 2012, James saved $480,000 in rent under the favorable lease, which is four times the debt he assumed on the farm. Mother Elma Hayes also gifted James $50,000 to $100,000 worth of farm equipment.

Jerry Hayes also calculated that a landlord under the typical crop share lease would roughly net $15,000 every two years on the Hayes' farmland, as compared to

3

$3,000 the landlord receives under the 1993 lease. James recognized this imbalance in a July 26, 2012 e-mail message to Jerry in which he demanded that Jerry pay him to retire the lease at a higher market rate for rent. James wrote:

> You are invited to buy out my interest in the lease of your land for the going market price established days ago when the Isaaks bought out my lease for 52,500/crop x 3 years or a total price of $157,500.

CP at 324.

Before preparation of the 1993 farm lease, Elma Hayes expressed an intent to keep the family farm as one unit with James as sole tenant and her other three children as co-landlords with herself. In accordance with this intent, attorney Kenneth Carpenter drafted a lease naming Elma, John, and Jerry Hayes and Patricia Elder as co-landlords. At trial, Carpenter testified the co-landlordship arrangement matched Elma Hayes' 1990 will that kept the farm in one unit rather than dividing the farmland into separate parcels for each child. Carpenter, however, did not draft Elma's 1990 will.

After Kenneth Carpenter's draft of the 1993 farm lease, Elma Hayes informed Carpenter that she questioned designating her other children as co-landlords. Carpenter advised Elma to be the only landlord signing the lease.

On December 22, 1993, Elma and James Hayes signed the farm lease respectively as sole landlord and tenant. John, Jerry, and Patricia did not sign the lease, although the lease contained signature lines for them. The lease entitled James to all crop revenue and any crop subsidies from the United States government. James agreed to pay Elma Hayes

4

$6,125 annually and to pay two loans. Four important paragraphs of the lease read:

> 10. Indulgence not a waiver. Any indulgence in the breach of any term, condition, or covenant of this Lease by the Landlord shall not constitute a waiver nor consent to a continuation or subsequent breach thereof.
>
> 11. Attorneys Fees, Law and Venue. In the event of a breach by any party of any of the terms and conditions of this Lease, the prevailing party shall be entitled to reasonable attorney's fees and court costs against the other party. This lease is made in accordance with, and shall be interpreted and governed by, the laws of the State of Washington. If any action or other proceedings shall be brought on or in connection with this Lease, the venue of such action shall be in Grant County.
>
> . . . .
>
> 13. No Other Agreements. It is understood that this Lease cancels all other agreements, written or oral, entered into or agreed upon by and between the Landlord and the Tenant.
>
> 14. Binding Effect-Assignments-Personal to Tenant. This Lease shall be binding upon the heirs, personal representatives, and assigns of the Landlord herein. It is understood that this Lease is personal to the Named Tenant, and no assignment or subletting or transfer by operation of law by the Tenant will be recognized, without the written consent of the Landlord. In the event the Tenant cannot personally perform the terms, conditions, and covenants required herein upon the Tenant, then this Lease will terminate immediately.

CP at 21-22.

After execution of the farm lease, Elma Hayes told her attorney Kenneth Carpenter that retaining the farm as one unit after her death was not a good idea. Carpenter, at Elma's request, prepared deeds to convey to each child a partial interest in separate portions of the farmland. In 2003, Elma asked Carpenter to prepare a new will to effectuate her plan to give each child complete ownership and control over a distinct parcel of farmland. The farmland was already conveniently separated into four detached

5

parcels.

Elma Hayes signed her last will and testament on January 28, 2003. The will reads, in pertinent part:

## ARTICLE V
### Specific Bequests

1. I hereby give, devise and bequeath to my son, JERRY D. HAYES, the following real property:

> All of Section 6, Township 25 North, Range 30 E.W.M., South of right-of-way and East of Hartline, Grant County, Washington, Parcel No. 18-1791-000.

2. I hereby give, devise and bequeath to my son, JAMES L. HAYES, the following real property:

> The South Half (S½) of Section 17, Township 25 North, Range 30 E.W.M., Grant County, Washington, Parcel No. 18-1827-000.

3. I hereby give, devise and bequeath to my son, JOHN D. HAYES, the following real property:

> The East Half (E½) of Section 18, Township 25 North, Range 30 E.W.M., Grant County, Washington, Parcel No. 18-1828-000.

4. I hereby give, devise and bequeath to my daughter, PATRICIA A. ELDER, the following real property:

> The West Half (W½) of Section 20, Township 25 North, Range 30 E.W.M., Grant County, Washington, Parcel No. 18-1833-000.

## ARTICLE VI
### Distribution of Residue

I hereby give, devise and bequeath all of the rest, residue and remainder of my property of every kind, nature and description, wheresoever located or situated unto JAMES L HAYES, JOHN D. HAYES, JERRY D. HAYES, and PATRICIA A. ELDER, as their sole and separate property.

CP at 200-01.

Elma Hayes died in February 2012. James Hayes and Patricia Elder serve as co-personal representatives of Elma's probate estate. With attorney Kenneth Carpenter's assistance, James and Patricia created an inventory of Elma's assets. The inventory lists the farm property, but not Elma's landlord interest under the 1993 farm lease. On June 18, 2012, James and Patricia distributed the farm parcels in accordance with Elma's 2003 will. The personal representatives did not expressly distribute the landlord's interest in the lease.

In July 2012, the four Hayes children met. According to Jerry Hayes, he received the least valuable land, while his brother, James Hayes, received the most valuable land. Because of this imbalance, the family agreed, at the meeting, that they would collectively bargain as a single unit with any prospective buyer of the land. The siblings wished to use a buyer's desire for the best land as leverage to achieve a higher land price for siblings that inherited less desirable land. The four rejected a pending offer from Isaak Land, Inc., which owned neighboring property, to purchase all 1,225 acres of the family

7

farm. Patricia, John and Jerry wished James to continue farming the land, in part, because James insisted on being paid to cancel the lease to free the land for sale.

On August 3, 2012, two weeks after the family meeting, James Hayes sold his parcel to Isaak Land for $575,000. In the contract, James warranted that he had "full power and right to sell and convey the property . . . free and clear of all liens, encumbrances, and defects." CP at 341.

Jerry Hayes contends James Hayes' sale of the latter's parcel cancels the entire farm lease. Accordingly, Jerry sent his brother James an e-mail message informing James that they should enter a new lease more representative of the market rate. James disagreed that his sale terminated the lease on his siblings' three parcels and offered Jerry the opportunity to purchase the tenant's interest in the lease for $157,500. James warned Jerry that he intended to farm his siblings' three parcels for those years remaining in the 25-year lease. James wrote:

> Dear Landlord.
> You are invited to buyout my interest in the lease of your land for the going market price established days ago when the Isaaks bought out my lease for 52,500/crop x 3 years or a total price of $157,500. You may then extend your 30/70 offer to any tenant you can find in the area. This offer last [sic] for 30 days.

CP at 315.

Jerry Hayes calculated that if he and his other two siblings accepted James' offer they each would receive less than $100,000 in inheritance. James, in turn, with the

8

buyout of the lease from his three siblings and the purchase price from Isaak Land, would inherit over $1,000,000. Because Jerry could no longer sell his less favorable land with James more favorable land, Jerry estimated that his land decreased in value by $50,000 to $150,000.

On October 30, 2012, Jerry sent James formal notice of termination of the lease on Jerry's parcel. James politely responded to his brother: "Jerry you are full of crap . . . I categorically reject your termination . . . . See you in court." CP at 326 (Ellipsis in original.)

## PROCEDURE

In February 2013, Jerry Hayes filed an unlawful detainer action against his brother James in Grant County Superior Court. The action seeks to evict James from Jerry's land. The record from that case is not before this court.

James Hayes filed this separate Lincoln County action, a petition under the Trust and Estate Dispute Resolution Act (TEDRA), ch. 11.96A RCW for a declaration of rights. In his TEDRA petition, James sought a court declaration that his mother intended to partition the 1993 farm lease into four disconnected leases based on the four parcels. He asked the trial court to find four separate leases, under which he is the tenant and the sole landlord is the one sibling who owns that parcel. In support of his petition, James Hayes filed declarations from himself and attorney Kenneth Carpenter.

9

Jerry Hayes responded to the TEDRA petition by asserting a variety of

counterclaims not relevant to this appeal and moved the superior court to strike his

brother's and Kenneth Carpenter's declarations. Jerry contended Carpenter's

declarations violated the attorney-client privilege. Jerry argued James' declaration

violated Washington's deadman's statute.

The court scheduled a hearing for June 20, 2013, to resolve the TEDRA petition.

In his prehearing memorandum of law, James Hayes identified two primary factual issues

the court should determine at the hearing:

> 1. Whether it was the intention of the decedent, Elma L. Hayes, to
> partition the 1993 Farm Lease into four separate leases, each such
> partitioned lease applicable to a single parcel of real property, and each
> such partitioned lease with a single Beneficiary as landlord, consistent with
> Article V of decedent's Last Will and Testament dated January 28, 2003 (as
> opposed to an intention to grant undivided interests in the 1993 Farm
> Lease, as tenants-in-common); and
> 2. Whether it was the intention of decedent, Elma L. Hayes, to
> preclude each Beneficiary from enforcing the covenants set forth in the
> 1993 Farm Lease, to the extent that those covenants do not apply directly to
> the parcel of real property bequeathed to that Beneficiary (as opposed to an
> intention to grant each Beneficiary the right to enforce such covenants as
> they may apply to parcels of real property bequeathed to other
> Beneficiaries).

CP at 139-40.

At the TEDRA hearing, the parties disputed the scope of the issues for the trial

court to resolve. The trial court knew of the unlawful detainer action pending before the

Grant County Superior Court. Thus, the court asked the parties how he could avoid

issuing a ruling that interfered with the unlawful detainer action. The parties' respective answers evolved during the hearing. James Hayes initially identified the issues before the trial court as Elma Hayes' intention with respect to her devise of the real property and the farm lease. The trial court restated James' answer in order to isolate the crux of the disputed question: "The question is when [James] sold this property to the Isaacs [sic], did this . . . unlawful transfer void the lease." Report of Proceedings (RP) at 34. Jerry Hayes objected: "that's the issue before [the Grant County Superior Court]." RP at 34. Jerry characterized the issue before the trial court as whether the lease remains in the estate and whether there are four separate leases.

The trial court understandably expressed concern that two judges were presiding over the same dispute. James Hayes attempted to clarify his request as being one to distribute the lease in accordance with his mother's intent of devising a separate lease for each child. James stated: "The issue is, was there an intent for [James] to forfeit his right to farm the leases of—sorry, farm the property of Patricia, John, and Jerry. Did Elma intend him to forfeit his right to farm those properties just because he sold his property." RP at 43. After trial court comments unfavorable to his position, James further refined the scope of his request:

> [W]e didn't ask you, Your Honor, to decide whether or not Mr. Hayes violated the lease. Okay? That's not before you. The issue before you is, one, for issuance of a declaration acknowledging and recognizing the intention of the decedent Elma L. Hayes, to partition the [1993] farm lease into four separate leases, each sub partitioned lease applicable to a

11

single parcel of real property and each sub partitioned lease with a single beneficiary or landlord consistent with Article V, with decedent's last will and testament dated January 28th, 2003. . . . And then for issuance of a further declaration acknowledging and recognizing the intention of the decedent, Elma L. Hayes, to preclude each beneficiary from enforcing the covenants set forth in the 1993 farm lease to the extent that those covenants do not apply directly to the parcel of the real property bequeathed to that beneficiary.

. . . .

Once we have those declarations, then [the Grant County Superior Court] can use the intent of the testatrix in order to decide what to do about the unlawful detainer action.

RP at 64-65. The trial court responded:

Well, whatever I decide would be determinative of his [the Grant County Superior Court's] decision. Whatever I decide, will then answer the question, it seems to me. It's not like he has to interpret anything. If I make a decision today, then his decision is done tomorrow or he's over with. Is there any issue that he would resolve and I wouldn't address?

RP at 66. James Hayes replied: "I think he would defer to your decision because you are the probate court, and you are interpreting a will, that's your primary jurisdiction." RP at 66.

At the June 20 TEDRA hearing, Jerry Hayes objected to the court considering live testimony from James Hayes and attorney Kenneth Carpenter. James, in turn, commented that the hearing was on the merits pursuant to RCW 11.96A.100, which allows the trial court to resolve all issues of fact and all issues of law. Jerry replied that he requested that the hearing be an initial hearing and that he had asked for a later trial to resolve any evidentiary issues because he had not yet conducted discovery or deposed

12

witnesses. The record shows no such earlier request from Jerry nor what Jerry intended

to be the limited scope of the initial hearing. By the end of the June 20 hearing, Jerry

relented and agreed to a hearing on the merits on the condition that the court continue the

hearing if it allowed James to present oral testimony.

At the TEDRA hearing, the trial court addressed the admissibility of Kenneth

Carpenter's and James Hayes' declarations. In addition to his attorney-client privilege

and deadman statute objections, Jerry Hayes argued, at the hearing, that the declarations

contained impermissible opinion testimony. Jerry asserted that, by his declaration,

Attorney Carpenter sought to offer an opinion when describing Elma Hayes' intentions.

The trial court rejected application of the attorney-client privilege, but struck

portions of attorney Carpenter's declarations because the testimony constituted

impermissible opinion testimony. The disputed portions of Carpenter's testimony are

reproduced below with a strike through the portions the court concluded were

inadmissible. From Ken Carpenter's first declaration:

> 3. For many years prior to her death in February of 2012, I performed legal services for Elma L. Hayes (hereinafter, "Elma"), and among the documents in my legal file, I have a Last Will and Testament of Elma L. Hayes which was executed on November 8, 1990, a copy of which is attached hereto as *Exhibit* 1. In general, this document, which was prepared by one of my law partners, ~~appears to have been designed~~ to distribute the balance of Elma's estate to her four children after the death of her spouse, Lloyd J. Hayes, ". . . equally, share and share alike, as their sole and separate property," without any devise of a specifically identifiable parcel of real property to any child.
>
> . . . .

9. Based upon my personal knowledge concerning Elma's estate plan in January of 2003, ~~I believe that it would be inconsistent with her intent to distribute to any of Elma's children a landlord's interest in any parcel of real property that she specifically devised to one of her other children~~.

CP at 158-60, 548.

From Kenneth Carpenter's supplemental declaration:

5. Some time after the 1993 Farm Lease was executed, Elma told me that her children had different opinions about how things should be done, and that it no longer seemed like a good idea to keep the family farm together after her death. In order to avoid future disagreements, instead of having her children share the farm property, ~~Elma decided to give to each child a separate parcel of property, with the understanding that James would be permitted to farm each parcel of property for the 25 years of his Lease~~. As it so happened, the family farm at that time consisted of four distinct parcels, and beginning in late 1994, Elma had me prepare deeds that would convey to each child a property interest in a particular parcel, with no two children receiving an interest in any one parcel.

. . . .

7. ~~Just as Elma had decided before executing the 1993 Farm lease that it was not a good idea to have her children as co-landlords during her lifetime, she had no intention of making them co-landlords after her death. The suggestion that Jerry (or, John or Patricia, for that matter) might have a legal right to receive profits from property owned by James himself or another sibling like the suggestion that Jerry (or, John or Patricia) might have a legal right to control what James did on property that was owned by James himself or another sibling is not only contrary to common sense, but also, totally foreign to what Elma Hayes was trying to accomplish through the specific bequests set forth in her 2003 Last Will and testament.~~

CP at 209-10.

At the June 20 TEDRA hearing, James Hayes sought to present additional oral testimony from Kenneth Carpenter. Jerry Hayes objected to any live testimony without

14

an opportunity to depose the witness. To resolve the procedural dispute, the trial court took a 15 minute recess so that Jerry could depose attorney Carpenter. When court resumed, Jerry reported to the court:

> Your Honor, we've had an opportunity to speak with Mr. Ken Carpenter, the attorney for the estate, and Mr. Carpenter has represented that he had no discussions regarding sale of the property or the lease or any term of the lease. He's unable to opine on that issue. For that reason, we are asking the court to move forward with either a dismissal or a ruling that the lease—that there's one unified lease and it has already been distributed. Should the court decide that it needs to undertake more exploration on petitioner's argument regarding tearing up the lease and rewriting four separate leases without any restrictive covenants, at that time, then we could hear additional testimony which would need to be set further down the road. Thank you, Your Honor.

RP at 70-71. James disagreed with Jerry's comments and offered proof of Carpenter's expected testimony.

> Your Honor, I would make an offer of proof as to—as to a couple of items of testimony. Mr. Carpenter would testify that each child would inherit his property subject to Jim's lease until Jim retired, with the end of the lease, which was coincided with the end of the lease. That each child— Where Jim would pay rent to each child based upon each child's acreage, not a one-quarter division, that he did *not* specifically discuss the effect of merger with Elma, and that he did *not* specifically discuss whether or not Jim could sell his property or whether there would be any effect, which wasn't discussed.

RP at 71 (emphasis added).

The trial court ruled Ken Carpenter's testimony irrelevant since Carpenter never discussed partitioning the lease with Elma Hayes. Accordingly, the court entertained no live testimony.

15

At the conclusion of the TEDRA hearing, the trial court ruled that Elma Hayes' will showed no intent to partition the lease along with the land. In reaching that conclusion, the court uttered remarks that James Hayes contends on appeal amounted to judicial bias and unacceptable judicial notice. The trial court commented:

> The purpose I'm trying to get over my head is—or through my head here is, this something unique here on succession planning of a farm, then general experiences throughout my years and what I see in court, when you deal with farming, the parents generally want to keep the farm land in the family. I grew up on a farm. I had two brothers and sisters similar to this, very interesting by the way. So my brother did farm after I left. I don't like tractor driving, so I was not about to stay there.
>
> But it's irrelevant, but anyway, so they do like to keep the farm in the family, and in this case, mom's declaration about one of the boys, as I indicated earlier—accorded earlier, is one of the boys would want to farm or not and that's when James stepped in at that time . . . .
>
> So he stepped in and he took over when the property was upside down, it appears, or at low profit at the time, low expectations—high hopes and high expectations that work was ahead of him. The low rent was favorable to tenant, and frankly, that happens very often with landlords, with their children, they want to give them an opportunity to acquire the equipment, machinery, and send them to farm, keep them around so they can—the family and children, grandchildren, things like that, so I didn't see anything different than that today.
>
> But what concerns me more than anything is having a son who would sell out his interest in the farm, which is contrary to most parents' purposes here, is to have the son farm, not to sell out. And so by his argument is, well, I didn't sell out, I'm still farming their property. But the problem I'm having with that is that's at the expense of their siblings, because the reason and purpose to sell it is keeping this property is five dollars an acre for—if it's 54 or 55 bushel ground or whatever is very—extremely—not just favorable, extremely favorable, without knowing the background, but right now, with the background's over and we're talking 20 years is over now, we're talking about the last five years of the lease. So what we're doing here is we are basically taking from three kids and giving to one.

That's the bottom line here, and what I see here, is the mother wanted to try to make this division to be fair, relatively fair, in the sense that each received their parcel, approximately 320, and I understand farmable acres are different, but they had about a quarter—a half a section each and different sections in Grant County. And so there wasn't one where you're going to get a house, you're getting cash. No. Everybody gets some land here, but I want my son to farm it for as long as he needs to or wants to. To me, that was a package deal. It was not something where you can bifurcate or chip off the properties.

So by intent, if it was otherwise, if Mr. Carpenter had indicated anything where they discussed it, because usually parents don't anticipate they're going to sell their part and continue the rest at that acreage because that defeats the purpose of why the five dollars was there in the first place is to keep him on the farm, not to keep him on the farm at the expense of the children off the farm.

So I just have a hard time to—I understand the merger doctrine does exist, and technically, there's some issues. If there was one lease with one person, but we have a lease on all four properties, it may be somewhat inconsistent, but I don't believe it's contrary to the mother's intent, where he could sell the property where he wants. I just can't go that route. I just find it too egregious of a—too much onerous on one side and a benefit to the other to honestly think that the parents—or the mother would want that. So that's my ruling. So I don't—

[Attorney for James Hayes]: Your Honor, what is your ruling—

JUDGE STROHMAIER: My ruling is I don't believe they intended that, so I'm saying that the lease continues on, that the lease paragraph when he sold his lease to the Isaacs [sic], that that in effect terminated the requirement, you know, it's personal to him only.

. . . .

[Attorney for James Hayes]: Does the court find, as requested in the petition, that there are four separate leases between Jim and each of his siblings?

JUDGE STROHMAIER: No. There's one lease. There's one lease with the mother, with him, and so I think I would have to make a—I would have to find some intent for the mom to want that and to result—that's what we're talking about today, and I don't find that to be the case.

RP at 73-76.

After the June 20, 2013 TEDRA hearing, James Hayes moved the trial court to reconsider its decision to strike portions of Kenneth Carpenter's declarations and its decision that James terminated the one unified lease encumbering the farm when he sold his parcel to the neighbors. James argued the order went beyond the scope of matters submitted to the court for determination and that the judge's own experience was irrelevant to determining Elma Hayes' intent.

In support of the motion for reconsideration, James Hayes filed another declaration from attorney Kenneth Carpenter. In the supplemental declaration, Carpenter attested that: (1) Elma told him the lease reflected her intent to reward James for assuming the farm debt; (2) Elma did not request the language prohibiting James from assigning his interest in the lease; (3) Elma told him that her children would not be able to work together; (4) Elma told him she wanted to divide the farm into four separate parcels and give each child a separate parcel; and (5) Elma asked him to complete the division of the family farm in her 2003 Last Will and Testament.

The trial court denied both posttrial motions. In denying the motion to reconsider, the trial court explained his reference to his prior farming experience. On appeal, James Hayes contends the additional statements, reproduced below, confirm bias and improper judicial notice.

> [R]eference to his prior farm experience was intended to show that
> he [w]as very familiar with and had substantial experience in dry land
> farming as a farm attorney in the area for over 27 years (former law offices

18

in Odessa, Ritzville, and Lind) and as one who had grown up on a farm in the area (15 miles southwest of Lind). This experience easily allowed this court to assert that the terms of this lease were obviously a "sweetheart" deal.

. . . .

Based on the court's prior experience, the court did take judicial notice of the very favorable lease terms to this tenant son for the purpose of determining the extent that the parents went to to [sic] encourage their son to continue with their family farming operations.

. . . .

The parents could have elected to lease out their farm to a neighboring tenant under rental rates estimated by Jerry Hayes to be at least $20-25/acre, but they did not. Obviously, they wanted one of their sons to continue with the family farm and assist them in paying off their accrued farm debt. These estimated rental rates appear very reasonable and are less than what the court would have expected for farm land in the Wilbur-Creston area. Coincidentally, farmers often enrolled their most marginal farm ground into the Conservation Reserve Program (CRP) for a ten-year period; and payments were regularly submitted and accepted for $50/acre in 1993 as well as in prior and subsequent years. The landlord would often contract to receive 50% of that annual payment.

This court's prior farm experience also allowed him to conclude that the extremely favorable terms of allowing the tenant son to take over the farming operations for a fixed $5/acre rental for an exceptionally long term of 25 years would only be given to close family members and not to third parties. The "boilerplate" language that Mr. Carpenter referred to was inserted because it is the custom and usage in the area and certainly would be expected in the present case. A tenant's interest in a farm lease is personal to that landlord; and tenants are certainly not interchangeable. Therefore, testimony would not be necessary to address the need for this "boilerplate" paragraph.

It would be highly unlikely that a parent who intends for all his or her children to inherit somewhat equally (in this case each child received a half section) could even conceive that the tenant son would elect to sell his respective interest in the farm but insist that he continue with the same extremely favorable terms against his siblings on the remaining portions after the parent's death. Either the tenant is farming the entire farm or he is not farming at all as there was but one farm lease. The parents' purpose to encourage a son to continue with the family farm and possibly for

19

successive generations would be defeated once the tenant son elected to sell his interest in the farm.

There was no evidence presented in this case showing that the mother, Elma Hayes, had intended or even considered that her son James Hayes could sell his inherited farm property but continue with the $5/acre rental against his siblings for the next five years to the end of the 25 year period. Therefore, this court held that James Hayes' sale of his half section constituted a transfer, assign or sublease of a part of the farming operation.

. . . .

CP at 617-19.

## LAW AND ANALYSIS

James Hayes asks this court to reverse the trial court and remand the case with directions to enter judgment in his favor because the decision to terminate his lease is contrary to the evidence and the law. Before this court reaches this dispositive question, we address other assignments of error forwarded by James: the trial court (1) erred, for numerous reasons, when it struck portions of Kenneth Carpenter's testimony; (2) impermissibly took judicial notice of facts reasonably in dispute; (3) demonstrated bias; and (4) exceeded the scope of the TEDRA petition in violation of due process by interpreting and enforcing the lease, an issue reserved for the unlawful detainer action in Grant County. The many issues and subissues prolong this opinion.

ISSUE 1: May a trial court, without a motion from a party, strike portions of a declaration?

ANSWER 1: Yes.

James Hayes first complains that the trial court sua sponte, Latin for "of one's own accord," struck portions of Kenneth Carpenter's declarations. James contends a trial court lacks authority to strike evidence on its own motion. We disagree.

Jerry Hayes objected to Kenneth Carpenter's testimony as improper opinion evidence, but he did so after the trial court raised the issue. In other words, the court raised the issue without prompting or suggestion. Thus, we proceed as if the court initiated the objection.

No Washington decision addresses this question. The prevailing, if not universal, rule is that a trial judge has the authority to exclude improper evidence even in the absence of an objection. *B.A. v. Webb*, 253 Or. App. 1, 289 P.3d 300, 306 (2012); *Stacks v. Stacks*, 2009 Ark. App. 862, 377 S.W.3d 265, 268 (2009); *Mo. Bd. of Nursing Home Adm'rs v. Stephens*, 106 S.W.3d 524, 529 (Mo. App. 2003); *Barrette v. Lopez*, 132 Ohio App. 3d 406, 725 N.E.2d 314, 321 (1999); *Morris v. Thomson*, 130 Idaho 138, 937 P.2d 1212, 1218 (1997). A court even has discretion in a jury trial to exclude evidence sua sponte if it believes it will mislead a jury or is unduly prejudicial. *Carson v. CSX Transp., Inc.*, 400 S.C. 221, 734 S.E.2d 148, 157 (2012).

As an alternative argument, James Hayes hugs a passage in an Alaska decision in contending that, while a judge may without a motion exclude evidence in some circumstances, the trial court committed error in our circumstances. In *Vachon v. Pugliese*, 931 P.2d 371, 381 (Alaska 1996), the Alaska Supreme Court wrote:

21

It is not an abuse of discretion for a judge to make *sua sponte* evidentiary rulings under certain circumstances. 1 JOHN W. STRONG, MCCORMICK ON EVIDENCE § 55, at 224 (4th ed. 1992) ("[T]he failure by the party does not of itself preclude the trial judge from excluding the evidence on his own motion if the witness is disqualified for want of capacity or the evidence is incompetent, and he considers that the interests of justice require the exclusion of the testimony."). However, "[i]t is only when the evidence *is irrelevant, unreliable, misleading, or prejudicial, as well as inadmissible*, that the judge should exercise his discretionary power to intervene."

(Emphasis added.) In light of this passage, James contends the trial court erred because Carpenter's testimony was not "irrelevant, unreliable, misleading or prejudicial." The record shows otherwise.

The trial court ruled Kenneth Carpenter's testimony to be irrelevant. The court rejected an offer of proof because Carpenter had no conversations with Elma Hayes about whether she intended to partition the lease if James sold the parcel she devised to him.

The issue of whether a trial court may, in a bench hearing, strike evidence on its own initiative is more theoretical than practical, thus rendering a rule allowing the striking sensible. Even if the court could not strike evidence on its own initiative, the trial court could still ignore the evidence when rendering a decision on the merits. The trial court does the parties a favor by expediting a hearing when it sua sponte excludes irrelevant testimony.

ISSUE 2: Did the stricken portions of Kenneth Carpenter's declaration constitute opinion evidence?

22

ANSWER 2: Yes.

James Hayes next argues that the stricken portions of attorney Carpenter's declaration were statements of fact, not opinions. James also argues that recitals of Elma Hayes' out-of-court statements are admissible under ER 803(a)(3), an exception to the hearsay rule admitting the declarant's then existing state of mind. The record demonstrates conversely. Carpenter did not testify to any particular statement of Elma Hayes relevant to the pending dispute.

Karl Tegland explains: "the appellate decisions offer little guidance on how to distinguish fact from opinion." 5B KARL TEGLAND, WASH. PRACTICE: EVIDENCE LAW AND PRACTICE § 701.2, at 6 (5th ed. 2007). Our high court's definition of "opinion testimony," however, in a criminal case provides some guidance. "Opinion testimony" is "'[t]estimony based on one's belief or idea rather than on direct knowledge of facts at issue.'" *State v. Demery*, 144 Wn.2d 753, 760, 30 P.3d 1278 (2001) (quoting BLACK'S LAW DICTIONARY, 1486 (7th ed. 1999)).

The trial court struck testimony from Kenneth Carpenter's declaration that "[j]ust as Elma had decided before executing the 1993 Farm lease that it was not a good idea to have her children as co-landlords during her lifetime, she had no intention of making them co-landlords after her death. [T]he suggestion that Jerry . . . might have a legal right to control what James did on property that was owned by James himself or another sibling—is not only contrary to common sense, but also, totally foreign to what Elma

23

Hayes was trying to accomplish through the specific bequests set forth in her 2003 Last Will and testament." CP at 210. This testimony did not arise from Kenneth Carpenter's conversations with Elma Hayes. Instead, the trial court discovered, after repeated questions to counsel, that Carpenter never discussed these subjects with Elma Hayes.

Even the subsequent declaration Carpenter submitted in support of James' motion for reconsideration failed to establish direct knowledge of Elma's intent regarding separate leases. In that declaration, Carpenter attests that (1) Elma told him the lease reflected her intent to reward James for taking on the loans; (2) Elma did not request the language prohibiting James from assigning his interest in the lease; (3) Elma told him before signing the Farm Lease that her children would not be able to work together; (4) Elma told him she wanted to divide the farm into four separate parcels and give each child a separate parcel; and (5) Elma asked him to complete the division of the family farm in her 2003 Last Will and Testament.

Ken Carpenter did not testify that he discussed with Elma Hayes whether she intended to permit James to continue farming his siblings' parcels if he sold his land or whether she intended the lease to merge. Carpenter's declaration provided circumstantial evidence of Elma's intent, but it did not show he had direct knowledge of the statements the court struck. Carpenter never heard Elma express an intent to permit James to continue farming all of the parcels after her death or her intent to partition the lease with

24

her bequests. Carpenter's testimony based on circumstantial evidence remains opinion testimony.

ISSUE 3: Did the trial court abuse its discretion when excluding the opinion testimony of Kenneth Carpenter?

ANSWER 3: No.

James Hayes subsequently contends that, even assuming the testimony of attorney Carpenter to be opinion evidence, the testimony is admissible. Jerry Hayes disagrees and argues the trial court permissibly excluded the evidence because of its confusing, misleading, or unfairly prejudicial nature. We agree with Jerry and hold that the trial court did not abuse its discretion when excluding the portions of the declarations.

This court reviews a trial court's decision to admit or exclude evidence for abuse of discretion. *State v. Bourgeois*, 133 Wn.2d 389, 399, 945 P.2d 1120 (1997). A trial court abuses its discretion when its decision is manifestly unreasonable or it exercises its discretion on untenable grounds or for untenable reasons. *State v. McDonald*, 138 Wn.2d 680, 696, 981 P.2d 443 (1999).

ER 701 permits a lay witness to offer opinions based on his or her rational perceptions when those perceptions are helpful to the determination of the fact at issue. The parties contest whether this rule permits a witness to testify to the state of mind of another. James cites two criminal cases wherein courts permitted witnesses to testify to the state of mind of another based on the witness' physical observations. *State v. Warner*,

25

134 Wn. App. 44, 58-59, 138 P.3d 1081 (2006); *State v. Perez*, 137 Wn. App. 97, 102, 151 P.3d 249 (2007). Jerry Hayes argues these cases are inapposite because they are criminal cases that allowed a witness to testify about their observations of another's physical demeanor.

Jerry and James overlook our Supreme Court's decision in *In re Estate of Black*, 153 Wn.2d 152, 167, 102 P.3d 796 (2004), which clarified the rule.

> A witness who personally observes an event can state an opinion, conclusion, or impression as to the event and may testify about the state of mind of another, so long as the witness personally witnessed events or heard statements that are relevant to prove the other person's state of mind.

(Internal quotation marks omitted.) The trial judge struck portions of Kenneth Carpenter's testimony and decided his live testimony was unnecessary because his opinion was not based on his personal knowledge. Carpenter lacked firsthand knowledge of Elma Hayes' intent or state of mind based on his physical observations of Elma during an event. James Hayes admitted that his mother never told Carpenter of her intent or lack thereof to permit James to continue farming all of the parcels after her death or intended to partition the lease with her bequests.

ISSUE 4: Must a trial court permit live testimony at a TEDRA petition hearing?

ANSWER 4: No.

26

James Hayes also argues the trial court erred by prohibiting Kenneth Carpenter from testifying at the June 20, 2013, TEDRA hearing. This argument ignores the nature of a TEDRA hearing and language of TEDRA statutory provisions.

The 1999 Trust and Estate Dispute Resolution Act (TEDRA) gathers statutory provisions for the resolution of disputes involving trusts and estates into a single chapter, RCW 11.96A. RCW 11.96A.010. The Act grants superior courts "full and ample power and authority . . . to administer and settle . . . [a]ll matters concerning the estates and assets of . . . deceased persons." RCW 11.96A.020. In enacting the 1999 bill, the legislature found, in part: "it is in the interest of the citizens of the state of Washington to encourage the prompt and early resolution of disputes in trust, estate, and nonprobate matters." RCW 11.96A.260.

TEDRA authorizes the court to resolve disputes by affidavits or declarations at an expedited hearing. RCW 11.96A.100 asserts, in part:

> (7) Testimony of witnesses may be by affidavit;
> (8) Unless requested otherwise by a party in a petition or answer, the initial hearing must be a hearing on the merits to resolve all issues of fact and all issues of law.

Nothing requires a court to resolve disputed fact issues on live testimony in a TEDRA action. The trial court may enter findings of fact based on the affidavits. *In re the Estate of Foster v. Gilliam*, 165 Wn. App. 33, 55, 268 P.3d 945 (2011).

ISSUE 5: Did the trial court impermissibly take judicial notice of facts?

27

ANSWER 5: No.

The trial court referenced some of his life experiences in his written ruling, rather than taking judicial notice of adjudicative facts. Whereas, a trial court should limit any reliance on personal experience, any error here was harmless since the evidence, if not undisputed evidence, verified the judge's experience and supported the trial court's ruling.

James Hayes contends the trial court impermissibly took judicial notice of disputed facts when denying his requested relief. Jerry Hayes disagrees, arguing the court permissibly relied on his common sense and everyday life experiences. But, Jerry argues, if the court took judicial notice, it did so of facts generally known within the territorial jurisdiction of the court.

The trial court stated, in his written ruling denying reconsideration, that he took judicial notice. He based his judicial notice on substantial experience as a farm attorney in Grant and Adams Counties and as a child on his family's Lind farm. We disagree with the trial court's use of the term "judicial notice" in this context. The trial court relied on personal experience rather than taking judicial notice of facts.

ER 201 permits a court to take judicial notice of "adjudicative facts . . . not subject to reasonable dispute" in the sense that they are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." A judge's own

28

knowledge should not be confused with judicial notice. *State v. K.N.*, 124 Wn. App. 875, 882, 103 P.3d 844 (2004). Personal knowledge is not judicial knowledge and the judge may personally know a fact of which he cannot take judicial notice. *Guyton v. Monteau*, 332 S.W.3d 687, 692-93 (Tex. App. 2011). A trial judge is prohibited from relying on his personal experience to support the taking of judicial notice. *United States v. Berber-Tinoco*, 510 F.3d 1083, 1091 (9th Cir. 2007).

If there is any error in the trial court's use of his farming experience, the error is in inserting himself as a witness in the suit, not taking judicial notice. Although James Hayes assigns error to the trial court taking judicial notice, James also suggests that the judge inserted himself as a witness. Thus, we rephrase the issue as to whether the trial court impermissibly became a witness.

Competing interests surface when addressing whether a judge may rely on personal experience when finding facts. On the one hand, the judicial system hopes for a judge possessing experience and knowledge of the workings of the world and the cogs of his community rather than a judge with a vacuumed mind. Agricultural settings, such as Lincoln and Grant Counties, would probably prefer trial judges to enjoy a background in farming and agricultural law. In turn, the two counties might expect the judge to rely on this background. After all, judges do not leave their common experience and common sense outside the courtroom door. *State v. Rainwater*, 75 Wn. App. 256, 262 n.7, 876 P.2d 979 (1994). Judges are human: like all humans, their outlooks are shaped by their

29

lives' experiences. *Del Vecchio v. Illinois Dep't of Corr.*, 31 F.3d 1363, 1373 (7th Cir. 1994).

On the other hand, parties deserve a decision based on evidence presented at trial and subjected to cross-examination rather than hidden or undisclosed preconceptions of the trial judge. A party may not cross-examine the knowledge and experience of a judge. A judge inserts himself into the presentation of evidence by basing decisions on his life background.

ER 605 reads:

> The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point.

This evidentiary rule can apply even when the trial judge does not formally testify, but inserts his or her own personal experience into the decision-making process. *Vandercook v. Reece*, 120 Wn. App. 647, 651-52, 86 P.3d 206 (2004); *United States v. Berber-Tinoco*, 510 F.3d 1083, 1091 (9th Cir. 2007).

Washington decisions tangentially address the question of whether a judge may rely on personal experience in issuing rulings. In *Fernando v. Nieswandt*, 87 Wn. App. 103, 940 P.2d 1380 (1997), this reviewing court found permissible a trial judge's referencing his personal experience in placing a child in a car seat when the judge awarded visitation to one parent. This court wrote:

> Rather, he was acting as a trier of fact and applying common sense to the facts of this dispute to make a decision. When the judge is a trier of

fact, illustrative comments phrased in the first person are not improper unless they evidence bias, prejudice, or other impropriety.

*Fernando*, 87 Wn. App. at 109.

In *State v. Grayson*, 154 Wn.2d 333, 111 P.3d 1183 (2005), the state high court reversed a trial court's refusal to grant a Drug Offender Sentencing Alternative (DOSA) sentence when the trial judge relied on his extrajudicial understanding that the DOSA program was underfunded. Still the court observed:

> Our judiciary benefits from and relies upon judges who have studied and become learned in the law and whose personal experiences have taught them a practical understanding of the world we live in and how people live, work, and interact with the world around them.
> We do not believe the legislature intended that judges leave their knowledge and understanding of the world behind and enter the courtroom with blank minds. Judges are not expected to leave their common sense behind. Nor do we believe the legislature expected judges to hold hearings on whether fire is hot or water is wet. We prize judges for their knowledge, most of which is obtained outside of the courtroom. Within the statutory and constitutional guidelines, judges may exercise their discretion to give a fair and just sentence.

*Grayson*, 154 Wn.2d at 339

We decline to explore the parameters of the prohibition of a judge relying on personal experience when rendering a decision, because such a juridical journey is unneeded in these circumstances. Any error by the trial court in relying on personal experience was harmless because the evidence overwhelmingly supported the trial judge's perceptions.

31

The trial court uttered or wrote the following comments that could be considered remarks based on his personal experience:

1. Parents want to keep the farm land in the family.

2. The low rent to James Hayes was favorable to him and was a "sweetheart deal."

3. Parents offer low rent to a child tenant, so the child will continue with family farming operations.

4. A son selling his interest in the farm is contrary to the desire of most parents.

5. Jerry Hayes' testimony of estimated market rental rates is reasonable and those rates are less than what the trial court would have expected for farm land in the Wilbur-Creston area.

6. Farmers often enroll their most marginal farm ground into the Conservation Reserve Program (CRP) for a 10-year period and, in 1993 and thereafter, received payments of $50 per acre. The landlord of CRP land would often contract to receive 50 percent of the annual payment.

7. The extremely favorable terms given to James Hayes of a fixed $5 per acre rental for a long term of 25 years would only be given to close family members.

8. The "boilerplate" language in James Hayes lease providing for termination upon transfer of the property is a customary clause in farm leases and

32

would be expected in Hayes' lease.

9. A tenant's interest in a farm lease is personal and tenants are not interchangeable.

James Hayes' own testimony supported many of the propositions announced by the trial court. For example, James testified by declaration that his "mother agreed to a relatively favorable annual cash rent, and she also agreed to extend the lease term to 25 years." CP at 215. In an e-mail message, James demanded that Jerry pay a higher market rate for rent if Jerry sought to cancel James' lease on Jerry's land. James declared that his mother did not wish to sell the land, but desired one of her sons to farm the family property.

The will of Elma Hayes expressed an intent to treat the four children equally. James' attorney and witness, Kenneth Carpenter, testified that the language terminating the lease upon a transfer in interest constituted boilerplate language.

Jerry Hayes' testimony also supported the propositions heralded by the trial judge. Jerry described the 1993 farm lease as a "sweetheart deal" for James. CP at 317. According to Jerry, James, through 2012, saved $480,000 in rent under the favorable lease, which is four times the debt he assumed on the farm. James also received, without any payment, $50,000 to $100,000 worth of farm equipment. In short, independent evidence from Kenneth Carpenter, Jerry Hayes, and James Hayes supported the trial court's personal observations, rendering any reliance on experience harmless. The

33

independent evidence supported the trial court's ruling.

*Vandercook v. Reece*, 120 Wn. App. 647, 86 P.3d 206 (2004) controls this appeal. In *Vandercook*, the trial court impermissibly relied on testimony from an earlier trial in a divorce case when rendering a decision, at the conclusion of a trial in a probate contest, that parties revoked a community property agreement. This court employed Washington's version of the harmless error rule. Evidential error is harmless if, without it, the trial court would necessarily have arrived at the same conclusion. This court ruled the trial court's error harmless because of independent evidence in the probate contest establishing revocation of the community property agreement.

*United States v. Berber-Tinoco*, 510 F.3d 1083, 1092-93 (9th Cir. 2007) addressed the same issue we entertain on appeal. The federal court of appeals ruled that three of the trial judge's remarks, during a motion hearing, violated FRE 605, the federal analog to Washington's ER 605. The trial judge commented during testimony to his knowledge of the location of stop signs on the subject road, the lack of any speed limit sign on the road, and the narrowness of a road. The appellate court then determined whether such violations were subject to harmless error review and, if so, whether the errors were harmless. The court noted that, in evaluating other violations of the federal rules of evidence, courts hold that a reversal of a district court's decision is not necessary so long as the reviewing court has a fair assurance that the verdict was not substantially swayed by error. The court found no reason not to apply this harmless error rule to violations of

34

rule 605. The appellant claimed that the district court's interjections in violation of rule 605 destroyed the court's image of impartiality and thus violated a constitutional right to an unbiased trial judge. In response, the Ninth Circuit observed that the Supreme Court requires recusal due to an appearance of bias only when a judge: (1) has a direct, personal, substantial pecuniary interest in the outcome; (2) becomes embroiled in a running, bitter controversy with a party; or (3) participates as part of the accusatory process. Rule 605 violations do not rise to this level. The trial court's comments based on his personal knowledge came in response to the criminal defendant's motion to suppress evidence. Based on an independent review of the record, the court of appeals ruled that the trial judge's unsupported remarks did not affect the decision to deny the defendant's motion to suppress.

ISSUE 6: Whether the trial court violated James Hayes' due process rights when it decided that James Hayes violated the farm lease when James sold his land to the Isaaks?

ANSWER 6: No.

James Hayes contends the court violated due process when it expanded the scope of the TEDRA proceeding from interpreting Elma Hayes' will to deciding whether he violated the farm lease. Jerry Hayes retorts that James asked the court to address issues inextricably linked to enforcing the farm lease and that TEDRA gave the trial court authority to settle this issue. Neither party addresses, however, the application of the due

35

process clause. Due process protects a person from state action depriving that person of life, liberty or property. Because court enforcement of a private contract does not constitute state action, due process protections do not apply.

The federal and Washington State Constitution contain identical clauses prohibiting the state from depriving any person of life, liberty, or property, without due process of law. U.S. CONST. amend. XIV; CONST. art. I, § 3; *Carlstrom v. Hanline*, 98 Wn. App. 780, 789-90, 990 P.2d 986 (2000). These clauses provide coextensive protections. *State v. Jordan*, 180 Wn.2d 456, 462, 325 P.3d 181 (2014).

To establish a violation of the due process clause, a person must identify state action that deprived him of a constitutionally protected interest in liberty or property. *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); *Bang Nguyen v. Dep't of Health Med. Quality Assurance Comm'n*, 144 Wn.2d 516, 522-23, 29 P.3d 689 (2001). To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d. 548 (1972). Such an interest is not created by the constitution, but by state law. *Roth*, 408 U.S. at 577.

James Hayes identifies his farm lease as a property right. Written contracts can create protected property interests when they evidence a formal understanding supporting

a claim of entitlement. *Perry v. Sindermann*, 408 U.S. 593, 601-02, 92 S. Ct. 2694, 33 L. Ed. 2 570 (1972); *see also Bishop v. Wood*, 426 U.S. 341, 344, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976); *Vanelli v. Reynolds Sch. Dist. No. 7*, 667 F.2d 773, 777 (9th Cir. 1982). Normally those contracts are between the person and the State. But a contract between private persons can support a due process claim if the State exercised coercive power or provided significant encouragement, either overt or covert, such that the choice to violate or enforce a contract is deemed to be that of the State. *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S. Ct. 2777, 73 L. Ed. 2d. 534 (1982). Under such circumstances, the enforcement of the contract becomes state action. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982).

When a court merely approves of or acquiesces in the initiatives of a private contracting party, there is no state action. *Blum v. Yaretsky*, 457 U.S. at 1004 (1982). State enforcement of a contract between two private parties is not state action. *State v. Noah*, 103 Wn. App. 29, 50, 9 P.3d 858 (2000). Judicial enforcement of a lease provision also does not constitute state action. *Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n*, 26 Cal. 4th 1013, 1033-35, 29 P.3d 797, 111 Cal. Rptr. 2d 336 (2001). If, for constitutional purposes, every private right was transformed into governmental action by the mere fact of court enforcement, the distinction between private and governmental action would be obliterated. *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 999 (9th Cir. 2013).

James Hayes expressly assumed obligations under the 1993 farm lease. Under the lease, he agreed not to sublet, assign, or transfer the lease. If he could not "personally perform the terms, conditions, and covenants required," he agreed the "Lease will terminate immediately." CP at 22. The judicial enforcement of this explicit agreement between two private parties does not amount to state action and thus cannot violate James' due process rights.

ISSUE 7: Did the trial court exceed the scope of the TEDRA hearing?

ANSWER 7: No.

James Hayes contends the trial court expanded the scope of the TEDRA hearing when it ruled he violated the lease by selling his section of land. He further argues he received no notice that the court would improperly expand the scope of the hearing. James emphasizes that, in his petition and prehearing memorandum, he requested the trial court declare his mother intended to partition the lease as she had the farm, and he asked the trial court to preclude his siblings "from enforcing the covenants set forth in the 1993 Farm Lease." CP at 63. He distinguishes between these requests for relief and the trial court's declaration that he violated the lease.

James Hayes' argument constitutes a funambulist's exercise. He in essence asks the trial court to declare that a flipped coin displays "heads," while precluding the court from declaring the other side of the coin to be "tails." A declaration by the trial court that Elma Hayes did not intend to partition the lease is in essence a declaration that James

38

Hayes violated the lease by selling his land. A request for relief to preclude his siblings from enforcing the promises of the 1993 lease initiates a ruling to enforce those promises. In his petition, James Hayes also requested the entry of further relief as the court may deem just and equitable, further inviting the court to declare James in violation of the lease covenant precluding a sale of land.

TEDRA empowers the court with full and ample power and authority to administer and settle all matters concerning the estates and assets of incapacitated, missing, and deceased persons, including matters involving nonprobate assets. RCW 11.96A.020(1). TEDRA defines a "matter" as the "determination of any question arising in the administration of an estate or trust, or with respect to any nonprobate asset, or with respect to any other asset or property interest passing at death." RCW 11.96A.030(2)(c). The legislature imbued the court with the "full power and authority to proceed with such administration and settlement in any manner and way that to the court seems right and proper." RCW 11.96A.020(2). The legislature's grant of power gave the trial court ample authority to resolve the termination of the farm lease, particularly in light of James' broad request for relief.

ISSUE 8: Did the trial judge violate the code of judicial conduct?

ANSWER 8: No.

James Hayes contends the trial judge violated Rule 2.11(a)(1) of the code of judicial conduct, which requires a judge to disqualify himself if his partiality could be

39

questioned. He further argues that this violation of the code deprived him of due process

of law. We disagree.

The United States Supreme Court has identified several bases when a judge's

appearance of partiality violated due process. Judges must recuse themselves to avoid

such violations when they have "a direct, personal, substantial pecuniary interest" in a

case. *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S. Ct. 437, 71 L. Ed. 749 (1927). Recently,

the court identified three new grounds when due process requires recusal: financial

interests falling short of what would be considered personal or direct; when a person with

a personal stake in a particular case had a significant and disproportionate influence in

placing the judge on the case; and criminal contempt cases or other cases where the judge

determined that a defendant should be charged. *See Aetna Life Ins. Co. v. Lavoie*, 475

U.S. 813, 822, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986); *Caperton v. A.T. Massey Coal

Co.*, 556 U.S. 868, 877, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009); *In re Murchison*,

349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955). Otherwise, most matters relating

to judicial disqualification do not rise to a constitutional level. *Caperton v. A.T. Massey

Coal Co.*, 556 U.S. at 876.

James Hayes contends the trial court exhibited bias because the court became Jerry

Hayes' chief witness and the court's comments evidence prejudice toward family farms.

The test for determining whether a judge's impartiality might reasonably be questioned is

an objective one that assumes the reasonable person knows and understands all the

40

relevant facts. *Sherman v. State*, 128 Wn.2d 164, 206, 905 P.2d 355 (1995). A judge is

presumed to perform his functions regularly and properly, without bias or prejudice.

*State v. Leon*, 133 Wn. App. 810, 813, 138 P.3d 159 (2006). A party asserting a violation

of the appearance of fairness doctrine must produce sufficient evidence demonstrating

bias and mere speculation is not enough. *Tatham v. Rogers*, 170 Wn. App. 76, 96, 283

P.3d 583 (2012).

James Hayes fails to establish, let alone argue, that the trial judge held any direct,

personal, substantial pecuniary interest, financial interest falling short of what would be

considered personal and direct, or any personal stake at all. Under due process precedent,

James falls short of establishing a due process violation even assuming his contentions to

be accurate.

ISSUE 9: Whether the trial court erred when ruling that Elma Hayes never

partitioned the farm lease?

ANSWER 9: No.

With the alleged procedural errors resolved, we focus on the substance of the

appeal. James Hayes argues that the trial court should have ruled that his mother

intended to partition the farm lease when she divided the farm into four sections, one for

each child, such that he was free to sell his parcel without terminating the lease on the

other three parcels.

We note that Elma Hayes, before her death, signed deeds of partial interests in a

tract to that child who inherited the particular entire tract upon Elma's death. James Hayes presents no evidence that, at the time of the earlier deeds, he contended that Elma had divided the lease into four separate leases. Nor is any evidence presented that Elma believed she had partitioned the farm lease into four leases when she earlier deeded interests to her four children. The personal representatives, one of whom is James Hayes, never formally divided the 1993 farm lease into separate leases after Elma's death. These facts alone might control the case and require affirmation of the trial court.

James Hayes initially argues that the farm lease encumbering his property was extinguished when he gained title to the parcel. In support of his argument he cites two Illinois cases: *Hill v. Reno*, 112 Ill. 154, 54 Am. Rep. 222 (1883); *Thomas v. Farr*, 380 Ill. 429, 44 N.E.2d 434 (1942). We agree that both Illinois decisions support a finding that James Hayes' tenant interest in his parcel merged when he received full title to the land upon his mother's death. Both decisions are murky, although arguably one or both suggests that a partitioned lease with multiple landlords creates a separate and distinct lease as to each landlord. Nevertheless, neither case goes the extra step and addresses the intent of a mother when devising farm land subject to a lease favoring one of the devisees.

The parties dispute the extent to which we defer to the trial court's ruling. Two lines of law clash under this setting. On the one hand, the trial court based its decision solely on a review of declarations. The trial court did not entertain any live testimony.

42

Under such circumstances, the reviewing court need not be bound by the trial court's factual findings. *Cornu-Labat v. Hosp. Dist. No. 2*, 177 Wn.2d 221, 229, 298 P.3d 741 (2013).

On the other hand, James Hayes asked the court to determine Elma Hayes' intent found in her will. Determining the intent of a testatrix is a factual question. *Niemann v. Vaughn Cmty. Church*, 154 Wn.2d 365, 374-75, 113 P.3d 463 (2005); *In re Riddell Testamentary Trust*, 138 Wn. App. 485, 491, 157 P.3d 888 (2007). This court reviews findings of fact for substantial evidence, which requires evidence sufficient to persuade a rational fair-minded person the premise is true. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). If this standard is satisfied, we will not substitute our judgment for that of the trial court even though we may resolve a factual dispute differently. *Riddell*, 138 Wn. App. at 492.

We need not decide whether to review the declarations fresh or to defer to the trial court's findings. Under either standard we would affirm the lower court.

When requested to construe a will, the paramount duty of the court is to give effect to the testatrix's intent. *In re Estate of Bergau*, 103 Wn.2d 431, 435, 693 P.2d 703 (1985). The intent must, if possible, be derived from the four corners of the will, and the will must be considered in its entirety, unaided by extrinsic evidence. *In re Estate of Griffen*, 86 Wn.2d 223, 226, 543 P.2d 245 (1975); *In re Estate of Mell*, 105 Wn.2d 518, 524, 716 P.2d 836 (1986). Before considering other evidence of a testator's intent, courts

must, if possible, ascertain such intent from the language of the will itself. *Estate of Bergau*, 103 Wn.2d at 435. When, after reading the will in its entirety, any uncertainty arises about the testator's intent, extrinsic evidence, including testimony of the drafter, may be admitted to explain and resolve the ambiguity. *Estate of Mell*, 105 Wn.2d at 524.

Elma Hayes' will shows a desire to treat all children fairly. She gave each child one of the four tracts comprising the family farm. Her residuary clause devised "all of the rest, residue and remainder of [her] property of every kind, nature and description, wheresoever located or situated unto [her children]." CP at 201. Under James Hayes' theory, the devising of the farm land into four tracts shows intent to split the 1993 farm lease into four discrete agreements. But the will does not divide the lease. Under James Hayes' plan, he may sell his parcel to a neighbor at a going rate free of the farm lease, while he can extort his siblings by demanding a lease buyout before each sibling may sell his or her parcel. James Hayes' scheme does not treat each child fairly.

Washington treats leasehold interests for a term less than life as personal property. *Andrews v. Cusin*, 65 Wn.2d 205, 207, 396 P.2d 155 (1964). Elma Hayes' will did not expressly devise the farm lease. As residue of her estate, the lease passed under the residuary clause. Legal title to property passing under a will's residuary clause upon completion of probate is held by the beneficiaries as tenants in common. *In re Estate of Telfer v. Bd. Of County Comm'r's*, 71 Wn. App. 833, 837, 862 P.2d 637 (1993). This court presumes Elma knew the law when she executed the will. *Estate of Mell*, 105

Wn.2d at 524. Under the residuary clause, Elma evidences her intent to devise the lease to her children as tenants in common.

Assuming we relied on extrinsic evidence, we would find the evidence also disassembles James Hayes' argument and plan. James contends there is no evidence his mother intended him to forfeit his lease if he sold the parcel she devised to him. We agree his mother did not think about his forfeiting the lease, but the mother never anticipated James to sell his parcel while holding his siblings to unfair lease terms. Elma Hayes wanted the farm land to stay in the family. She granted her son the favorable terms under the lease with the expectation he would farm for 25 years. James fails to identify any evidence showing his mother wished to partition the farm lease or to allow him to sell his land clear of the lease, while his siblings' parcels remain encumbered by the lease.

James Hayes emphasizes that his mother's omitting signatures of his siblings as landlords under the 1993 farm lease meant she did not wish them to be landlords together. Along these lines, Elma Hayes did not wish for one sibling to have a leasehold interest in another sibling's parcel. Nevertheless, James' contention says nothing about Elma Hayes' intent as to what would happen upon her death and the repercussions of James' selling his interest in the land, but demanding that his siblings conform to the favorable lease terms with respect to his siblings' property.

A related question is whether James Hayes violated the farm lease, when selling

his parcel, resulting in the lease's termination. Under its TEDRA authority, the trial court concluded the farm lease ended by its terms upon James' sale of his parcel to Isaak Land. James argues he did not violate the covenant in Article 14 that prohibited him from assigning, subletting, or transferring the lease. We disagree in that the covenant expressed an intent that the tenant remain the sole farmer on the four parcels, so that the family farm would remain as one. By selling his parcel, James transferred control of a portion of the family farm to a third party.

James Hayes ignores another covenant he made. He agreed that, in the event he cannot personally perform the terms, conditions, and covenants required upon the tenant, the lease terminates immediately. Thus, the lease automatically terminated if he could not personally perform any of the 21 other covenants he made. Among other promises, James agreed to devote the entire 1,225 acres he leased, including his parcel, to growing a crop and farming in a good and sufficient farm-like manner. He cannot personally perform any of these promises on the parcel of land he sold. As a result, the lease terminated by its own terms.

James Hayes argues equity disfavors requiring him to forfeit his rights under the lease. As a matter of equity, the court enjoyed broad discretion to do substantial justice. *In re Foreclosure of Liens*, 123 Wn.2d 197, 204, 867 P.2d 605 (1994). This court reviews a court's exercise of such discretion for abuse. *In re Foreclosure of Liens*, 123 Wn.2d at 204. Under equity, Washington disfavors forfeitures unless the right thereto is

46

so clear as to permit no denial. *John R. Hansen, Inc. v. Pac. Int'l Corp.*, 76 Wn.2d 220, 228, 455 P.2d 946 (1969). James argues the right to forfeit the lease was not clear because nothing in the lease prohibited the landlord from selling his interest. Nevertheless, the farm lease shows an intent to keep the family farm as one. The lease provides for termination if the tenant cannot personally perform his promises. We hold that the trial court did not abuse its discretion.

ISSUE 10: Should this appellate court grant James Hayes attorney fees and costs?

ANSWER 10: No.

In his reply brief, James Hayes asks this court to award him attorney fees and costs pursuant to RAP 18.1 and TEDRA. RAP 18.1 requires a party requesting attorney fees to devote a section of its opening brief to the request for fees or expenses. RAP 18.1(b). "This requirement is mandatory. This requirement also demands more than a bald request for attorney fees on appeal." *Osborne v. Seymour*, 164 Wn. App. 820, 866, 265 P.3d 917 (2011) (internal citations omitted). James did not request attorney fees or costs until his response brief, and he provided nothing but a bald assertion in support of his request. Because he failed to comply with the mandatory requirements in RAP 18.1, we deny his request.

ISSUE 11: Should this reviewing court grant Jerry Hayes reasonable attorney fees and costs on appeal?

ANSWER 11: Yes.

47

Jerry Hayes also asks this court to award him reasonable attorney fees and costs from James. He argues TEDRA and the 1993 farm lease entitle him to an award.

We need only address the terms of the lease. The lease provides:

> 11. <u>Attorneys Fees, Law and Venue.</u> In the event of a breach by any party of any of the terms and conditions of this Lease, the prevailing party shall be entitled to reasonable attorney's fees and court costs against the other party.

CP at 21. As analyzed above, James Hayes breached the lease.

James Hayes counters by arguing this court should not award fees under the 1993 farm lease because its interpretation and enforcement were not before the TEDRA court. As ruled above, the lower court held authority to address these issues under TEDRA. As the prevailing party, Jerry is entitled to reasonable attorney fees and costs.

## CONCLUSIONS

We affirm the trial court's ruling that the 1993 farm lease ended with respect to all land thereunder when James Hayes sold his parcel of land. We grant Jerry Hayes an award of reasonable attorney fees and costs on appeal.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, J.

_____
Lawrence-Berrey, J.

48