# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57714-3-II |
| Respondent, | |
| v. | |
| JOSEPH RAYMOND CHEATUM, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, C.J. — Joseph Cheatum was a foster, adoptive, and stepparent to several children. Two of his adult children, KC and MBC, recall Cheatum touching them sexually when they were minors. Cheatum's stepdaughter, KC, recalls repeated incidents of sexual touching over her clothing when she was aged 15 to 19. Cheatum's adoptive daughter, MBC, recalls repeated incidents of sexual touching over her clothing beginning when she was 11 or 12. MBC also recalls Cheatum touching her underneath her underwear on one occasion when she was 12 or 13. Several years after the abuse, KC and MBC reported Cheatum's abuse to police out of concern for their younger siblings' safety. Following an investigation, Cheatum was arrested and charged with the second degree child molestation of MBC, third degree child molestation of KC, and second degree incest of KC. A jury found Cheatum guilty on all counts. Cheatum moved the court to arrest the judgment pursuant to CrR 7.4, arguing that the court should vacate his second degree molestation conviction and enter a conviction of third degree molestation because the charging information

and to-convict jury instruction included dates at which MBC was over the age of 14. The trial court denied Cheatum's CrR 7.4 motion.

Cheatum appeals his conviction, arguing that the trial court made several erroneous evidentiary rulings, erred in denying his CrR 7.4 motion, and violated the appearance of fairness doctrine. We disagree and affirm.

## FACTS

### I. BACKGROUND

Cheatum and his wife, Britton Buckley, were foster, adoptive, and stepparents to several children including KC and MBC. Buckley's daughter, KC, was born in 1993 and lived with Cheatum as his stepdaughter from approximately 2008 until 2012. Cheatum's adopted daughter, MBC, was born on July 17th, 2002, and lived with Cheatum from 2014 to 2019. MBC moved into Cheatum's home as a foster child at 11 years old and was adopted by Cheatum at 12 years old.

In 2019, Cheatum's then-foster child, ND, told his social worker that Cheatum was physically abusive toward JBC, Cheatum's adopted son, during a family vacation in Texas. This led to a police investigation during which KC and MBC reported to law enforcement that Cheatum molested them when they were children living in his home.

### II. TRIAL

Cheatum was later charged with the second degree child molestation of MBC, third degree child molestation of KC, and second degree incest of KC. As it relates to MBC, the charging information alleged that Cheatum, "on or between January 1, 2015 and July 16, 2018," had sexual contact with MBC, who at the time was "at least twelve (12) years old but less than fourteen (14) years old." Clerk's Papers (CP) at 1. The information was accompanied by an affidavit of probable

cause stating that MBC told police that Cheatum touched her underneath her underwear when she was approximately 13.

A. Testimony of Alleged Victims

The alleged victims, KC and MBC, testified about the details of Cheatum's sexual abuse and related behaviors. KC explained that she was 14 or 15 years old when Cheatum began dating her mom, Buckley. During the early part of their relationship, Cheatum was very affectionate toward KC and liked to buy her gifts. KC explained that Cheatum told her that she "had a nice body" and became increasingly "touchy-feely," hugging her from behind and wrapping his arms around her tightly. Verbatim Rep. of Proc. (VRP) at 294-96.

KC went on to describe escalating sexual harassment and abuse during the time she lived with Cheatum as his stepdaughter: she recalled Cheatum "spooning" her on the couch and "rubbing" her body. *Id.* at 297. KC explained that Cheatum regularly crawled into her bed in the morning, under the covers, usually wearing nothing over his boxers. KC explained that Cheatum's behavior escalated until he began to touch her pubic area and nipples over her clothes. She recalled this behavior beginning in 2008, when she was 15, and continuing until 2012.

KC also testified that Cheatum offered her alcohol when she was about 16 or 17. When the prosecutor asked KC, "[W]hat was the situation where he would offer you alcohol?" Cheatum objected that the topic was irrelevant. *Id.* at 314. The objection was overruled, and KC explained that when Cheatum offered her alcohol, "we talked about running away" and "where we could go." *Id.*

MBC testified that Cheatum began to touch her sexually "[w]ithin the first few months" that she lived with Cheatum, when she was 11 or 12 years old. *Id.* at 359.[1] MBC explained that Cheatum was "touchy-feely" from the beginning and "always held [her] hand, kissed [her] on the mouth, [and] would cuddle with [her]." *Id.* at 358. MBC testified Cheatum began to enter her room and shut the door and spoon her "[a]lmost every morning, if not every morning." *Id.* at 366. When Cheatum spooned MBC, she could feel "the imprint of his penis" behind her. *Id.* at 370.[2]

MBC also testified that on one occasion, Cheatum reached into her underwear while he was spooning her on the couch. During direct examination, MBC stated that this occurred around "[s]ummer of 2015" when she was "between 12 and 13 years old." *Id.* at 368. Cheatum cross examined MBC about the date of that incident, asking "In fact, you don't even have an exact year that it happened. Again, it happened a long time ago?" *Id.* at 395. MBC responded, "Yeah. It was between the ages of 12 and 13." *Id.* Cheatum then attempted to impeach MBC with prior testimony in which MBC agreed that the incident occurred sometime between 2015, when she was 12, and 2018, when she was 15. When confronted with her prior testimony and asked about the "broad range" of time between 2015 and 2018, MBC explained, "I didn't give a broad range, but it was given to me. There may have been a miscommunication." *Id.* at 396. On redirect, the State elicited the following exchange:

> Q. So in that prior proceeding, I asked you how old you were?
> A. Yes.
> Q. And what was your answer?
> A. Between 12 and 13.

---

[1] MBC was 11 when she moved into Cheatum's home in March 2014 and turned 12 on July 17th, 2014.

[2] Although MBC testified she did not know whether Cheatum's penis was erect, this is implied from the fact that she could feel its "imprint" against her body. VRP at 370.

> Q. And then the awkward prosecutor at that time, myself, asked you another question after that, correct?
> A. Yes.
> Q. And then for some reason I asked whether you definitely were between 12 and 15?
> A. Yes.
> Q. Okay. And that still is a true statement; is that correct?
> A. Yes.

*Id.* at 403.

MBC also described Cheatum making frequent comments about her weight and her body as she went through puberty. When asked if those comments had a "lasting effect," Cheatum objected to the line of questioning as irrelevant. *Id.* at 374. The court overruled the objection and MBC explained, "I struggle with anorexia eating disorder and I have a really bad relationship with food." *Id.* She went on to testify that she attributes her eating disorder and body image struggles to Cheatum's behavior.

B. Testimony of Victims' Siblings

The State offered the testimony of MBC's biological brother, JBC, who lived in the Cheatum home as a foster and adopted child at the same time as MBC. JBC testified that Cheatum's inappropriate behavior began "a few months" after MBC and JBC moved into the home, then escalated. *Id.* at 227. JBC explained that Cheatum was "touchy" toward MBC and that he saw Cheatum "smack [MBC's] [a**]." *Id.* at 221. JBC also saw Cheatum spooning MBC on the couch and in MBC's bed. JBC observed that Cheatum often went into MBC's room wearing only his boxers and would close the door behind him. JBC also testified, without objection, that Cheatum "made a lot of very inappropriate comments about [MBC's] figure" and made "creepy" comments about MBC's breasts. *Id.* at 221, 226.

5

The State also offered the testimony of KB, a foster child in Cheatum's home from approximately 2015 to 2018. KB testified that she saw similar inappropriate cuddling and saw Cheatum enter MBC's bedroom regularly in his boxers and close the door. KB also testified that Cheatum made inappropriate comments to MBC regarding her weight and appearance while shopping. Cheatum objected but did not state a ground, and his objection was overruled. The State later asked KB whether she observed "red flags" in the home, and Cheatum objected that the question was irrelevant and would elicit improper opinion testimony. *Id.* at 271. The court overruled the objection and KB explained that Cheatum would frequently compare MBC's body to KB's.

The State also offered the testimony of ND, a foster child in Cheatum's home from 2017 to 2019. ND shared that he frequently saw Cheatum cuddling with MBC on the couch and in MBC's room and did not see similar contact between Cheatum and his other children. ND also testified, without objection, that he heard Cheatum make comments about MBC's breasts and clothing in a way that was "way too personal" given MBC's age at the time. *Id.* at 184.

C. Law Enforcement Witnesses

The State called two law enforcement witnesses: Officer Brian Rydman and Detective Jeremy Holmes. Officer Rydman explained that he was dispatched to the Cheatum home in July 2019 due to a CPS referral about possible sex offense and abuse allegations involving children. Upon arriving at the Cheatum home, Officer Rydman interviewed MBC, who reported that Cheatum touched her "private parts" when she was 13. *Id.* at 138. Officer Rydman testified that he then requested assistance from Detective Holmes.

Detective Holmes testified that he arrived at the Cheatum home after being briefed by Officer Rydman and by the social worker. Detective Holmes also explained that he was informed that there may be another potential victim, KC. During direct examination, the State asked Detective Holmes to "describe what a confrontation call is," and Cheatum objected that the question was irrelevant. *Id.* at 159. The court overruled Cheatum's objection and Detective Holmes explained that he asked Buckley to agree to make a confrontation call and she refused. He explained that the confrontation call would entail making "a recording of a private phone call conversation to Joseph Cheatum, regarding the allegations. It would basically be her confronting him with it to see if it was true or false." *Id.* at 160.

The State also asked Detective Holmes general questions about delayed disclosure, and Cheatum objected to those questions.[3] The trial court sustained Cheatum's objections as to testimony of Detective Holmes' "general opinion" about delayed disclosure and explained, "your question only becomes admissible - or the answer admissible if it pertains to the delay in this case." *Id.* at 162. The State then asked Detective Holmes, "What was your understanding of the reason for the delay in this case involving these children?" *Id.* at 163. Cheatum objected on hearsay grounds and his objection was overruled. The following exchange ensued:

A. So based on my training and experience that I have with [MBC] --
    [Cheatum]: Your Honor, see, that goes to the general nature of it. So I have the same objection as leading to the other objections.
    THE COURT: I don't know how you know that. He hasn't answered the question.
    [Cheatum]: That's what I'm trying to prevent, Your Honor.
    THE COURT: You may continue your answer.

---

[3] The ground for the objection is not clear, but appears to be either relevance or foundation: "Your Honor, I'm going to object. It's beyond." VRP at 162.

A. The delay by [MBC], there's multiple factors obviously in play. But this - the biggest delay here could have been fear, fear for herself or fear for others and maybe some sort of fear in retaliation. And a lot of times --
[Cheatum]: Your Honor, that calls for speculation.
THE COURT: Overruled.

*Id.* at 163-64. Detective Holmes went on to testify that he understood MBC to have delayed disclosing the abuse out of fear for the safety of JBC.

D. Defense Witnesses

Cheatum's wife, Buckley, testified in Cheatum's defense case that Cheatum would kiss MBC and KC on the mouth and would hug MBC from behind while she was doing dishes. Buckley also confirmed "he would go up in his boxers" to MBC's room but denied seeing Cheatum spooning with MBC. *Id.* at 430.

During cross examination, the State began to question Buckley about whether law enforcement requested she make a confrontation call to Cheatum. Cheatum objected on the ground that the question was beyond the scope of direct and was irrelevant. The court overruled the objection and the State then elicited testimony that Buckley chose not to make the confrontation call. The State later asked Buckley why she refused to make the call, and Cheatum objected that the question was irrelevant. The court overruled the objection and Buckley explained that she did not want to call Cheatum late at night while Cheatum was driving home from the airport.

The State continued questioning on this topic, asking Buckley whether, when she declined to make the call, she understood that the call would be "one of the only ways for law enforcement to discern what really happened." *Id.* at 450-51. Cheatum objected that the question called for speculation and the court overruled his objection. The State continued questioning and Cheatum interjected to lodge another objection while Buckley was explaining that the officer "indicated that

he would like me to have Joe contact the police department when he got in." *Id.* at 451. The basis for Cheatum's objection was that the line of questioning "goes to privileges." *Id.* The court overruled the objection and Buckley explained that she felt she was very cooperative to the police investigation because she called Cheatum later and asked him to contact law enforcement. The following exchange ensued:

> Q. ([State]) Oh, okay. And - and didn't law enforcement tell you that these types of calls are in effort to find --
> [Cheatum]: Your Honor, this is improper questioning.
> THE COURT: [Cheatum], you've made the same objection several times and I've overruled it.
> [Cheatum]: I know. But I've got to make it each question.
> THE COURT: You have an objection to this line of questioning. You may answer the question.
> [Cheatum]: So I have a standing objection.
> THE COURT: Complete your question, [State].

*Id.* at 452. The State later asked Buckley, "Isn't it true that you love your husband and you didn't want to find out the possibility or let law enforcement find out the possibility that this was true?" *Id.* at 453. Cheatum again objected that the question was "improper" and the court overruled the objection. *Id.* Buckley answered that she loved her husband but denied that the reason she refused to make the confrontation call was to protect him.

Cheatum then testified in his defense. Cheatum denied spooning or otherwise touching KC or MBC inappropriately, but agreed that he cuddled with both of them. Cheatum agreed that he went into MBC's room in the morning wearing nothing over his boxers but denied getting in her bed and stated that he would sit on the edge of her bed outside of the covers.

9

E. Jury Instructions and Verdict

Instruction 3 informed the jury that second degree child molestation requires "sexual contact with a child who is at least twelve years old but less than fourteen years old." CP at 127. Instruction 8 informed the jury that, to convict Cheatum of second degree child molestation,

> each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or between January 1, 2015 and July 16, 2018, the Defendant had sexual contact with [MBC];
> (2) That [MBC] was at least twelve years old but less than fourteen years old, at the time of the sexual contact and was not married to the Defendant;
> (3) That [MBC] was at least thirty-six months younger than the Defendant; and
> (4) That this act occurred in the State of Washington.

*Id.* at 128. The jury was also instructed that "[s]exual contact means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desires of either party."

*Id.* at 113.

In the first trial in this case, in which the jury was unable to reach a verdict, Cheatum proposed the following instruction that was adopted by the court:

> To convict the defendant of the crime of child molestation in the second degree, as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or between January 1[st], 2015 and July 16[th], 2018, the defendant had sexual contact with MBC;
> (2) That MBC was at least twelve years old but less than fourteen years old, at the time of the sexual contact and was not married to the defendant;
> (3) That MBC was at least thirty-six months younger than the defendant and was not married to the defendant; and
> (4) That this act occurred in the State of Washington.

*Id.* at 88. During the trial at issue in this appeal, the court proposed adopting the same instruction. Cheatum responded that he had no exceptions. The court adopted the instruction verbatim.

10

The jury found Cheatum guilty of second degree child molestation, third degree child molestation, and second degree incest.

F. Motion for Arrest of Judgment

Cheatum moved the court to vacate the jury's guilty finding of second degree child molestation.[4] Cheatum asked that the court vacate the conviction under CrR 7.4 because the jury's finding did not comport with the statutory elements of the crime because the to-convict jury instruction included dates at which MBC was over the age of 14. Cheatum did not present legal argument as to why the motion should be granted but asserted that the discrepancy between the charged dates and MBC's age was "something both attorneys realized after trial." *Id.* at 137.

The court heard argument on Cheatum's motion on the same day as the sentencing hearing. The court first questioned the attorneys about the exact dates charged and the age that MBC would have been during the charging period. The court and parties determined based on MBC's birth date of July 17th, 2002, that MBC was 12 on the first date of the charged period, January 1, 2015, and was 15 on the last day of the charged period, July 16, 2018.

The court then questioned the attorneys about why the issue was not addressed earlier. The State's attorney explained that a prior prosecutor drafted the information and that the dates contained in the instructions were transferred over from the information as a result of the prior prosecutor's drafting and MBC's poor recollection. The State conceded that the conviction should be vacated because "clearly the gap bridges the degrees and it's impossible to tell exactly what the jury decided." VRP at 570. The court asked Cheatum why he did not make any motion or objection

---

[4] Although Cheatum titled this a motion for judgment notwithstanding the verdict and the parties refer to it as such in their briefing, the motion was actually made pursuant to CrR 7.4(a)(2) (arrest of judgment due to flawed charging information).

to the instructions. Cheatum did not give a reason but noted that he requested a lesser included instruction during the pretrial conference, but denied that the range in the information or instructions was the reason for that request.

The court ultimately denied Cheatum's motion for arrest of judgment. It concluded that any error in the jury instructions was harmless because "the testimony of the victim, that she was 13 when this crime occurred, is the only evidence upon which the jury would have been able to render a verdict." *Id.* at 580. It also noted that the parties had "more than adequate notice" of the date range and were "clearly aware of it," but "chose not to do anything about it before the verdicts were rendered." *Id.* at 580-81.

Cheatum now appeals.

DISCUSSION

I. THE DATE RANGE ISSUE

Cheatum raises two claims related to the date range of his second degree child molestation count against MBC: First, he claims that the information was defective because the date range identified for the commission of the crime overshot the date on which MBC turned 14, which transformed the charge into one for child molestation in the third degree despite language in the information that clearly stated that MBC was at least 12 years old but less than 14 years old during the commission of the crime. The State responds that under the liberal construction to be applied to charging documents that are challenged for the first time after the verdict, the information only needed to state the required age range—not the date of the alleged criminal conduct—to state every essential element of the crime. Alternatively, the State argues that any error in the charging period was harmless beyond a reasonable doubt

12

No. 57714-3-II

Second, he claims that the to-convict instruction in this case relieved the State of its burden to prove every element of the crime of child molestation in the second degree because the date range identified in the first element of the crime straddled the time in which MBC was younger than age 14 and over age 14. Cheatum approaches these errors through the lens of the trial court's denial of his posttrial motion to arrest judgment, arguing that the trial court erred in denying his motion.[5] The State responds that this error was invited because Cheatum proposed the instruction he now challenges. Additionally, the State responds that this claim fails on its merits because the evidence was sufficient to prove that MBC was at least 12 but less than 14 years old at the time of the crime, and any error in the to-convict instruction was harmless.

We agree with the State and affirm.

A. LEGAL PRINCIPLES

Criminal defendants are entitled to notice of the State's charges against them. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Canela*, 199 Wn.2d 321, 328, 505 P.3d 1166 (2022). A charging information gives the defendant notice of these charges through "a plain, concise and definite written statement of the essential facts constituting the offense charged." CrR 2.1(a)(1). A charging information must set forth all the essential elements of the crime charged. *State v. Pry*, 194 Wn.2d 745, 751, 452 P.3d 536 (2019).

---

[5] Though Cheatum also cited to CrR 7.5 in this motion, he made no argument that a new trial should be granted and did not identify which of the eight grounds for new trial he was relying upon. He did not advocate for a new trial but rather asked that the second degree child molestation verdict be vacated and that he be found guilty of third degree molestation instead. Nor does he argue in this appeal that he was entitled to a new trial. Thus, we treat Cheatum's motion as the trial court did, as a CrR 7.4 motion to arrest judgment.

An information that omits an essential element of the crime charged is constitutionally deficient. *Id.* at 752. Essential elements are the elements of the crime that are " 'necessary to establish the very illegality of the behavior.' " *Id.* (quoting *State v. Johnson*, 119 Wn.2d 143, 147, 829 P.2d 1078 (1992)). To give the defendant sufficient notice, the charging information must allege specific facts that support each essential element. *Id.*

The supreme court "has established a presumption in favor of the validity of charging documents when the challenge is made after conclusion of the trial." *Canela*, 199 Wn.2d at 329. "Charging documents which are not challenged until after the verdict will be more liberally construed in favor of validity than those challenged before or during trial." State v. *Kjorsvik*, 117 Wn.2d 93, 102, 812 P.2d 86 (1991). This is to discourage the "defense practice wherein the defendant recognizes a defect in the charging document but foregoes raising it before trial when a successful objection would usually result only in an amendment of the pleading." *Id.* at 103.

Like a charging document, a to-convict jury instruction must contain every essential element of the charged crime. *State v. DeRyke*, 149 Wn.2d 906, 910, 73 P.3d 1000 (2003). This is because "constitutional due process requires that the State prove every element of the [charged] crime beyond a reasonable doubt." *State v. France*, 180 Wn.2d 809, 814, 329 P.3d 864 (2014). If an erroneous to-convict instruction relieves the State of its burden to prove every element of the crime beyond a reasonable doubt, then the error is structural and the defendant is entitled to automatic reversal. *DeRyke*, 149 Wn.2d at 912; *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999).

However, if the alleged instructional error did not relieve the State of its burden, we apply the constitutional harmless error analysis. *DeRyke*, 149 Wn.2d at 912. A constitutional error is

harmless beyond a reasonable doubt when the record contains overwhelming untainted evidence that "necessarily leads to a finding of guilt." *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985). "We review the adequacy of a challenged 'to convict' jury instruction de novo." *State v. Mills*, 154 Wn.2d 1, 7, 109 P.3d 415 (2005).

Under CrR 7.4, a judgment "may be arrested" when "the indictment or information does not charge a crime." CrR 7.4(a)(2). A defendant's CrR 7.4 motion "shall identify the specific reasons in fact and law as to each ground on which the motion is based." CrR 7.4(b). We review a trial court's ruling on a CrR 7.4 motion for arrest of judgment de novo, engaging in the same inquiry as the trial court. *State v. Ceglowski*, 103 Wn. App. 346, 349, 12 P.3d 160 (2000).

B. APPLICATION

Cheatum argues that the trial court erred in denying his motion to arrest judgment and refusing to vacate his second degree child molestation conviction based on alleged errors in the charging information and the to-convict jury instruction. We hold that the information was not constitutionally deficient, and decline to review Cheatum's challenge to the to-convict instruction because Cheatum invited the error.

*(1) Charging information*

In Cheatum's view, the second degree child molestation charge in the information was constitutionally deficient because it alleged that Cheatum's criminal conduct occurred on or between January 1, 2015 and July 16, 2018, whereas MBC turned 14 on July 17, 2016. We conclude that the charging information adequately alleged the essential elements of the crime of second degree molestation of a child and that Cheatum cannot show he was prejudiced by the information's language.

Because Cheatum failed to challenge his charging information until after the jury reached its verdict, we must presume the information was sufficient and read the information in a commonsense manner and liberally construe its language. *Canela*, 199 Wn.2d at 329; *Kjorsvik*, 117 Wn.2d at 102. Accordingly, we apply the two-part test our supreme court adopted in *Kjorsvik*:

> (1) do the necessary facts appear in any form, or by fair construction can they be found, on the face of the charging document and, if so, (2) can the defendant show that he or she was nonetheless actually prejudiced by the inartful language that caused a lack of notice?

*Pry*, 194 Wn.2d at 752-53. We reach the second prong only if the necessary elements are found or fairly implied from the face of the information. *Id.* at 753.[6] Because the second prong is focused on actual notice, we may examine other documents such as an affidavit of probable cause when addressing the second prong. *Id.*

Here, the information plainly contains the essential elements of the crime charged because it alleges Cheatum had sexual contact with MBC when MBC was "at least twelve (12) years old but less than fourteen (14) years old." CP at 1. This is an accurate statement of the facts supporting the age element of the crime charged, notwithstanding that the information also alleged that the conduct occurred "on or between January 1, 2015 and July 16, 2018." *Id.* Indeed, these two factual allegations do not conflict with one another—the clause stating MBC's age at the time of the molestation implies a narrower time period at which the criminal conduct could have occurred—and we read the information to apply common sense and to "include facts which are necessarily

---

[6] When assessing the first prong, we may examine the entire information, including other charged counts. *Pry*, 194 Wn.2d at 753. "If the necessary elements are not found or fairly implied, we presume prejudice and reverse without reaching the second prong and the question of prejudice." *Id.*

implied." *Kjorsvik*, 117 Wn.2d at 109. Here, the allegation that MBC was between 12 and 14 at the time of the assault satisfies the first prong of the *Kjorsvik* test.

The second prong asks whether Cheatum "actually received notice" of the charges against him and whether this rendered him unprepared to defend against the charges. *Kjorsvik*, 117 Wn.2d at 106. Cheatum makes no attempt to show a lack of notice or any other manner of actual prejudice to his defense.[7] Nor can he, because the information informed him clearly of the charges he faced and the underlying factual allegations. Additionally, the information was accompanied by an affidavit of probable cause alleging that he touched MBC underneath her underwear when MBC was age 13.

Moreover, even if Cheatum lacked notice before his first trial, he certainly had notice before his second trial and could have moved to amend the information at any time. And the record reveals that Cheatum was aware of the significance of the dates contained in the information to some extent because Cheatum attempted to impeach MBC's recollection by asking about her prior testimony in which the State referred to that timeline. Although Cheatum maintains that he did not notice the discrepancy in the dates until after the jury reached its verdict, Cheatum's impeachment attempt shows that the prior testimony should have brought the discrepancy to Cheatum's attention

---

[7] Cheatum asserts without argument, "While Mr. Cheatum is not required to demonstrate prejudice, he has done so in this case." Br. of Appellant at 14. We disagree.

earlier. Therefore, we conclude that the information in this case was not constitutionally deficient.[8]

(*2) Jury instruction*

Cheatum argues that the to-convict instruction for second degree child molestation violated his right to due process because it relieved the State of its burden to prove every element of the crime charged by permitting the jury to find him guilty based on conduct that occurred after MBC turned 14. We decline to review Cheatum's claim of error.

The invited error doctrine prohibits " 'a party from setting up an error at trial and then complaining of it on appeal.' " *City of Seattle v. Patu*, 147 Wn.2d 717, 720, 58 P.3d 273 (2002) (quoting *State v. Pam*, 101 Wn.2d 507, 511, 680 P.2d 762 (1984), *overruled on other grounds by State v. Olson*, 126 Wn.2d 315, 893 P.2d 629 (1995)). An error is deemed invited if the defendant affirmatively assented to the error, materially contributed to it, or benefited from it. *In re Pers. Restraint of Coggin*, 182 Wn.2d 115, 119, 340 P.3d 810 (2014).

Invited error prevents review of instructional errors even if they are of constitutional magnitude. *Patu*, 147 Wn.2d at 720. Therefore, a party may not request a jury instruction and complain on appeal that the requested instruction was given. *State v. Hood*, 196 Wn. App. 127, 131, 382 P.3d 710 (2016). For example, in *Patu*, the to-convict jury instruction omitted an essential element of a crime charged. 147 Wn.2d at 720. The supreme court held that even if the erroneous

---

[8] To the extent Cheatum claims that the trial court erroneously concluded that any error in the information was waived and denied his motion for arrest of judgment without reaching its merits, we disagree. The trial court here did not conclude that any error was waived—it determined that any error in the date range was harmless because MBC testified that she was 13 at the time of the assault and the jury heard no evidence that would support a finding that she was older than that. Thus, the cases Cheatum relies upon are inapposite because the trial court did not rule that the challenge was waived.

instruction would have been grounds for reversal, the court's review of the defendant's constitutional claim was barred by his own proposal of the defective instruction. *Id.* at 721.

Just as in *Patu*, here, Cheatum proposed the very instruction he now complains of. Because Cheatum was the proponent of the instruction that he now seeks to challenge on appeal, the invited error doctrine precludes review of the merits of his alleged error.

Because the information was not deficient and any error in the to-convict instruction was invited, Cheatum's claims of error related to the date range of the crime fail.[9]

## I. EVIDENTIARY RULINGS

Cheatum argues that the trial court erroneously admitted evidence that deprived him of a fair trial. We disagree.

### A. LEGAL PRINCIPLES

We review a trial court's determination to admit or exclude evidence for an abuse of discretion. *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007). The trial court abuses its discretion when its ruling is based on untenable grounds or made for untenable reasons. *Id.* "Failure to adhere to the requirements of an evidentiary rule can be considered an abuse of discretion." *Id.* We may also find an abuse of discretion where the trial court's ruling is unsupported by the record or applies the wrong legal standard. *State v. Salgado-Mendoza*, 189 Wn.2d 420, 427, 403 P.3d 45 (2017).

An erroneous evidentiary ruling merits reversal only if the defendant shows the ruling was prejudicial. *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001). Prejudice requires showing

---

[9] In light of our resolution of these claims, it follows that the trial court did not err in denying Cheatum's motion for arrest of judgment.

that " 'within reasonable probabilities,' " the error " 'materially affected' " the outcome of the trial. *Id.* (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

B. ANALYSIS

Cheatum argues that several evidentiary errors deprived him of a fair trial. We disagree because many of these errors were not preserved for this appeal and because Cheatum has not shown that he was prejudiced either individually or cumulatively by the errors that were preserved.

*(1) We decline to consider Cheatum's arguments that were not raised below.*

Here, Cheatum argues for the first time on appeal that the trial court erred when it allowed the State to elicit testimony that Buckley declined to make a confrontation call to Cheatum during the police investigation. Cheatum contends that this amounts to an improper comment on his silence. We decline to consider the argument.

We generally decline to review errors that an appellant raises for the first time on appeal. *See* RAP 2.5. Counsel may not " 'remain silent at trial as to claimed errors and later, if the verdict is adverse, urge trial objections for the first time in a motion for new trial or appeal.' " *State v. Kendrick*, 47 Wn. App. 620, 636, 736 P.2d 1079 (quoting *State v. Bebb*, 44 Wn. App. 803, 806, 723 P.2d 512 (1986)), *aff'd*, 108 Wn.2d 515, 740 P.2d 829 (1987). However, errors affecting a manifest constitutional right may be raised for the first time on appeal. RAP 2.5(a)(3).

Because Cheatum fails to demonstrate that the confrontation call testimony amounts to manifest constitutional error, we need not review it for the first time on appeal. *See id.*; *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). Cheatum did not object at trial or move to strike on Fifth Amendment grounds any of the statements at issue. Cheatum objected to the testimony below on the ground that it was irrelevant, speculative, and related to "privileges." VRP

at 451. These objections were insufficient to afford the trial court an adequate opportunity to prevent or remedy the error Cheatum now complains of on appeal.[10] Thus, we decline to review his challenge to the confrontation call testimony.

Cheatum goes on to argue that the trial court erroneously admitted MBC's testimony that MBC developed anorexia as a result of the abuse. Cheatum argues that this testimony was speculative, but did not object on this ground before the trial court. We decline to review this testimony because Cheatum did not alert the trial court to this argument below.

Cheatum also challenges the court's rulings allowing testimony that Cheatum provided alcohol to minors and that Cheatum commented on MBC's body and clothes. Cheatum argues that this testimony was inadmissible pursuant to ER 404(b) and because it is irrelevant. Cheatum objected to this testimony before the trial court only on the ground of irrelevance and did not raise the ER 404(b) issue before the trial court. We therefore decline to review whether the complained of testimony constituted impermissible prior bad act evidence pursuant to ER 404(b). RAP 2.5.

Accordingly, we decline to entertain Cheatum's argument that the trial court erroneously allowed improper comments on his silence, allowed speculative testimony regarding MBC's anorexia, and allowed impermissible testimony regarding prior bad acts without performing the proper ER 404(b) analysis.

---

[10] Moreover, even if the error was preserved, Cheatum fails to explain how the challenged testimony amounts to an improper comment on his silence. He asserts without citation that the State invited the jury to infer his guilt because he did not talk to the police. Our search of the record revealed no such argument. Rather, the record shows that the State elicited the challenged testimony in its cross examination of Buckley to show her bias.

*(2) Cheatum has not shown he was prejudiced by any alleged error.*

Cheatum's remaining arguments do not merit reversal because he fails to show that any error resulted in prejudice. *See Neal*, 144 Wn.2d at 611.

Cheatum argues that the trial court abused its discretion when it allowed Detective Holmes to testify about his opinion of why MBC may have delayed disclosing her sexual assault. He argues that the testimony was inadmissible due to lack of foundation and because it was speculative.[11] Cheatum goes on to assert without argument that this testimony was prejudicial because the case resulted in a prior mistrial.

Because Cheatum fails to show prejudice, he is not entitled to reversal. Cheatum has made no reasoned argument showing that the testimony had the capacity to change the outcome of his trial. Cheatum asserts that we should find any evidentiary error prejudicial because there is a "fine line" between conviction and acquittal and because the first jury was unable to reach a verdict. Br. of Appellant at 22. But he also agrees that "the delay in disclosing was not part of the defense case," thus minimizing the testimony's potential impact. *Id.* at 20. He has therefore failed to show that the challenged testimony was reasonably likely to have a material impact on the outcome of the trial.

Nor does Cheatum proffer any argument that he was prejudiced by the testimony regarding his provision of alcohol to minors or his comments on MBC's body and clothes, either individually or cumulatively. Moreover, he appears to challenge only the testimony of KB regarding Cheatum's comments about MBC's weight and clothing, not the testimony of the other witnesses who testified

---

[11] With respect to foundation, Cheatum vaguely objected that the testimony was "beyond" and that Holmes was not disclosed as an expert. VRP at 162. We assume without deciding that this was sufficient to preserve his argument that the testimony lacked foundation.

to that effect.[12] Even if KB's testimony on that topic was admitted erroneously, the jury was exposed to the same content through other witnesses—MBC and ND both testified that Cheatum made inappropriate comments about MBC's breasts and clothing, drawing no objection from Cheatum. Therefore, to the extent Cheatum has preserved his challenge that any testimony was erroneously admitted that should have been excluded under ER 404(b), we conclude that he has not made a showing sufficient to warrant reversal.

## II. APPEARANCE OF FAIRNESS

Cheatum argues that the trial court violated his right to an impartial tribunal. We disagree.

### A. LEGAL PRINCIPLES

The appearance of fairness doctrine seeks to prevent any issues of "a biased or potentially interested judge." *Tatham v. Rogers*, 170 Wn. App. 76, 95, 283 P.3d 583 (2012). Judges are required to disqualify themselves in a proceeding if the judge's impartiality might reasonably be questioned. CJC 2.11(A). "The test for determining whether a judge's impartiality might reasonably be questioned is an objective one that assumes the reasonable person knows and understands all the relevant facts." *In re Est. of Hayes*, 185 Wn. App. 567, 607, 342 P.3d 1161 (2015).

---

[12] Cheatum makes the following assignment of error: "6. The trial court erred when it allowed ER 404(b) evidence against Mr. Cheatum." Br. of Appellant at 1. He identifies the following issue regarding this assignment of error: "6. Whether testimony related to Mr. Cheatum's comments regarding a victim's weight and clothes was relevant to the issues at trial?" *Id.* at 4. He never identifies *which witness* made the challenged comments, but we infer that he is challenging only KB's testimony because he cites only to KB's testimony for these comments in his statement of the case, and even if he were attempting to challenge MBC's and ND's comments on this topic, we would decline to consider the challenge because Cheatum did not object to the testimony of MBC or ND on this topic before the trial court.

No. 57714-3-II

A trial judge is presumed to have acted without bias or prejudice. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004). In order to overcome this presumption, the appellant " 'must provide specific facts establishing bias.' " *Tacoma S. Hosp., LLC v. Nat'l Gen. Ins. Co.*, 19 Wn. App. 2d 210, 218, 494 P.3d 450 (2021) (quoting *Davis*, 152 Wn.2d at 692). A party does not need to prove actual bias; mere suspicion of partiality may be sufficient to require recusal. *Id.* However, the appellant must produce sufficient evidence to demonstrate bias, beyond mere speculation. Hayes, 185 Wn. App. at 607. "Judicial rulings alone almost never constitute a valid showing of bias." Davis, 152 Wn.2d at 692.

B. ANALYSIS

Cheatum asserts that he is entitled to reversal because his due process right to an impartial judge was violated. Cheatum's argument is based primarily on the court's evidentiary rulings and disposition of his motion to arrest judgment. Cheatum also takes issue with the judge's perceived attitude regarding his evidentiary objections and alleges that the judge "interjected himself into the trial by giving the prosecution theories on how to get certain evidence admitted." Br. of Appellant at 30-31.[13]

---

[13] Cheatum cites to the following exchange for the characterization that the judge supplied the prosecution with theories on the admissibility of evidence:

> Q. Okay. Generally, what are the reasons for that delay[ in the disclosure of childhood sexual assault]?
> [Cheatum]: Your Honor, same objection.
> THE COURT: I'm going to sustain the objection as to a general opinion about it.
> Q. [State] What are some reasons why children delay in disclosing?
> [Cheatum]: Again, I have the same objection.
> THE COURT: Mr. Jackson, I think - I think your question only becomes admissible - or the answer admissible if it pertains to the delay in this case.
> [State]: Okay.

VRP at 162-63.

We conclude that Cheatum has not shown a violation of the appearance of fairness doctrine. We presume the judge was impartial, and Cheatum cannot point to any non-speculative reason that would tend to overcome that presumption. The judge's rulings are insufficient to demonstrate bias and the judge's comments regarding the admissibility of evidence do not show that the judge's impartiality might reasonably be questioned. We therefore reject Cheatum's argument and affirm the trial court.

### CONCLUSION

Finding no reversible error, we affirm Cheatum's conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, C.J.

We concur:

LEE, J.

PRICE, J.