IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Domestic Violence Protection Order for: | ) ) ) ) ) ) ) | No. 40361-1-III |
| REJOICE GADZA NEAL. | | UNPUBLISHED OPINION |

LAWRENCE-BERREY, J. — Joseph Muigai appeals the trial court's decision to grant a domestic violence protection order (DVPO) against him protecting Rejoice Neal. Muigai argues the trial court committed several errors when it determined his versions of events were not credible. He also argues the trial court's findings were insufficient to grant the protection order. Neal responds, in part, that the appeal is moot because the DVPO has expired. We disagree with that argument. We nevertheless affirm the protection order.

FACTS

In October 2023, Joseph Muigai filed a petition for a DVPO against Rejoice Neal. The two had been in an intimate relationship. Neal subsequently filed a petition for a

DVPO against Muigai. The following facts are taken from their declarations, police reports, medical records, text messages, and photographs.

Neal and Muigai met in 2021 through a mutual friend while she lived in Maryland and he lived in Spokane. Muigai is a licensed practical nurse, and Neal is a certified nurse assistant. They began a romantic relationship and talked and texted daily. Neal knew that Muigai was in divorce proceedings with his wife at the time.

Muigai bought plane tickets for Neal to travel to and from Maryland to Spokane a couple of times, but they had to cancel due to COVID restrictions. In December 2021, Muigai purchased another plane ticket for Neal, who flew to Spokane for one week. While there, Muigai asked her to be in a relationship with him and she agreed. She stayed at his house, and their relationship became intimate.

During the visit, Muigai asked Neal to move to Spokane, as he was starting an adult family home caregiving service in his home and believed she could work for him. Over the following year, Muigai flew Neal to Spokane twice and continued to ask her to work for him and move into his house. While in Spokane, the two continued their intimate relationship. However, Muigai did not want Neal to walk outside his house because neighbors might see her and he thought this would affect his divorce.

In her declaration in support of a DVPO, Neal claimed Muigai began to ask her to move to Spokane by December 2022 because he had two clients moving into his house in the first week of January. He told her it was important that she be there to take care of them because he had another job. He offered to pay for her classes so she could be trained and licensed to work as a caregiver in Washington. Neal felt pressured but agreed to move. Muigai disputes this and claims that Neal moved to Spokane in January because her lease ended in December.

Regardless, Neal arrived in Spokane on December 21, 2022. Neal claimed that Muigai began to move her things into the spare bedroom, which confused Neal because she thought they had been in an intimate relationship. Muigai then admitted he had not told his children about her because he was afraid of how they would react. When Neal became upset, Muigai agreed to move her belongings into his room and tell his family about her. Muigai and Neal were intimate that first night.

Neal claimed that the following morning, Muigai left the house and did not return until evening. He did not inform her where he was going, and she felt that his behavior toward her had changed. That evening, Neal confronted Muigai about his changed

3

behavior, and he told her that he did not need her for anything, just for sex.[1]  The two were not intimate that night.

*First alleged sexual assault*

Neal claimed that the next day, she again tried to speak with Muigai about his behavior, and Muigai complained about her refusing to have sex with him and asked her to sleep in the spare bedroom.  She agreed.  He bought her a bed and said it was a gift if she agreed to continue having sex with him.  Muigai disputes this and claimed in his declaration that he bought Neal a bed and moved her into the spare room because his snoring kept her awake.

According to Neal's version of events, on December 24, 2022, Muigai came to her room and wanted sex.  She refused.  Muigai ignored her wishes and forced her to have sex with him.  After, Muigai threatened to kick her out if she called the police; he also showed her the machete he kept in his bedroom.  The next morning, on Christmas, Muigai left the house early in the morning.  Neal was scared to call the police because she did not know anyone in Spokane and feared she would become homeless because she did not have enough money to drive back to Maryland.  Muigai came home that

---

[1] The statement Muigai purportedly uttered was vulgar.  Muigai disputes ever making the vulgar statement.  Regardless, because unpublished opinions are public, we have chosen to sanitize the statement.

afternoon and told her he was going to his son's house for a Christmas party. However, because he and his ex-wife agreed that girlfriends could not come to family events, he was going alone.

After he left, Neal called the police and reported that she had been raped the previous night. Muigai came home while the police were taking her statement. The police took Muigai's statement and completed a police report. Muigai offered to buy Neal a hotel room for a night, and the police encouraged her to accept. She refused because she did not know anyone in Spokane and would be homeless after that night.

After the police left, Neal claimed in her declaration that Muigai threatened to deport her to Africa and use his machete to kill her if she pursued criminal charges—as it would ruin his business and life. Neal said that Muigai assaulted her and bruised her. She said she took pictures of the bruises but could not find them.

Muigai admitted he did not tell his children that he and Neal were in a relationship and that he went to the Christmas party alone. He denied sexually assaulting Neal. When he came home, he was shocked to learn Neal claimed he raped her. Neal later cried, apologized, and told him she was afraid of being abandoned. She also told him she did not claim rape but that the police suggested he had raped her. Muigai also denied

5

threatening to use his machete on Neal. He claimed he kept the machete, which he uses as a gardening implement, near his bedside because he does not believe in guns.

The police report Neal filed with her declarations indicated she told the police she "just met" Muigai and she had sex with him "approximately ten times" since she arrived in Spokane. Clerk's Papers (CP) at 58. The report stated that Muigai had been treating Neal poorly because he told her he "only desires sexual intercourse" from her, nothing more. CP at 58. The police officer did not see any signs of injury on Neal. When the officer spoke with Muigai, Muigai indicated he believed Neal was upset because he had not been home very much since she had moved in with him. The officer noted that Neal did not want to leave Muigai's home and refused any assistance the police offered.

The police officer went back to the house a few hours later when Neal called 911 and reported Muigai threatened to kill her. Muigai denied making any threat. Neal requested transport to the hospital and the officer waited with her until medics arrived.

Neal called the police a few days later and asked that the case be dismissed. The police came to interview her. She told them Muigai had apologized and was remorseful. The police completed a report. Neal stated in her declaration that she recanted because she felt Muigai had complete control over her as it was winter, and she lacked a support system.

The police report covering her recantation indicates that when the police officer approached the door to Neal's room, the officer could hear her speaking with someone on the telephone. He observed that she sounded in "good spirits." CP at 62. When the officer asked why she recanted, she said Muigai was sorry and did not intend for the incident to happen as it did. Neal then stated she did not want to be a rape victim. When the officer repeatedly asked if Muigai forced her to recant, she insisted it was her own decision.

*Working for Muigai*

Neal claimed that from then on, they lived together but were no longer in a relationship. However, every few days, Muigai would ask her for sex but she always said no. No client moved into the house in January as Muigai had represented. Neal stayed at the house while Muigai worked. One day in January, Muigai's son visited the house while Muigai was away and was surprised to find Neal living there. He did not know who she was. A client moved into the house in March, and Neal started working for Muigai. He paid her $2,000 every two weeks. Neal believed their relationship was strictly employer-employee, but every few days, Muigai came to her bedroom asking for sex. She always refused.

Muigai claimed in his declaration that he and Neal continued to have consensual sex. He attached text messages that he claimed showed they arranged to have consensual sex, pointing to "thumbs up" and "wink wink" symbols or an "[I]'ll meet you downstairs." CP at 88.

Neal claimed that her daughters wanted to move to Spokane from Maryland and that she asked Muigai if they could stay with them. Muigai said they could stay until they found an apartment. But once they arrived, Muigai pressured Neal for sex in exchange for allowing her daughters to stay. Neal refused and found her daughters an apartment as soon as possible. Around this time, Neal found an Xfinity model XW4 camera in the home's common area. Neal provided a photograph of the camera positioned in Muigai's living room in her declaration. When Neal confronted Muigai about the camera, he said he wanted to know what she did and who she was talking to while he was gone. Neal claimed that Muigai eventually moved it to the garage but pointed it at her car so he could track her movements. Neal began to split her time between her daughters' apartment and her room in Muigai's house, claiming she was uncomfortable at his house.

Muigai claimed that Neal invited her family to live in his home without telling him. He provided text messages supporting this claim. Muigai also said that Neal moved

into his room one month before their arrival. In his declaration, he stated that he never used a camera in his house and the only camera was in his garage, and it did not record.

*Second alleged sexual assault*

In October 2023, Neal came home late one night and went to sleep. She woke when Muigai pressed himself against her back. She claimed he then used his fingers to sexually assault her. She asked him to stop, but he continued. After this happened, Neal told Muigai she was calling the police to report him. She claims Muigai then threatened to beat her until she was unrecognizable. He reminded her of his machete and said he would use it.

After Muigai left Neal's room, she claimed she called the police and reported the assault. Neal spent the rest of the night at the hospital and then went to her daughters' home. Her MyChart digital medical records reflected a summary of her hospital visit. The summary included an antibiotic prescribed by the provider and a subheading titled "Diagnosis." CP at 69. Beneath the diagnosis subheading, was "Sexual assault of adult, initial encounter." CP at 69.

Muigai disputed Neal's rendition of events. He claimed he entered her room with permission, and they had consensual sex. After consensual sex, Neal complained he did not give her enough attention, and she thought he was using her for sex. She then said

she was going to call the police and tell them he was using her.  However, he claimed

Neal did not call the police.

*Proceedings*

When Neal filed her protection order petition, she asserted that Muigai used drugs.

In response, Muigai disputed her assertion and provided a negative drug test result.

At the protection order hearing, Muigai claimed the picture showing the camera

was a phone jack.  The commissioner disagreed but believed it was not relevant.

However, the commissioner denied both petitions finding neither party demonstrated

domestic violence by a preponderance of the evidence.  Neal filed a motion to revise the

commissioner's ruling.

During the revision hearing, Neal argued she was coercively controlled because

Muigai had pressured her to move.  Once she was in Spokane without a job or

possessions, she was completely isolated, and their relationship changed.  She felt she

had to stay to avoid becoming homeless even though Muigai sexually assaulted her and

frequently pressured her for sex.  Neal argued to the trial court that the texts at the

beginning of their relationship explicitly referenced sex, so Muigai's argument that they

later referred to sex by code was not believable.

Muigai argued that although the way they referred to sex changed, it was not indicative of sexual assault and maintained they continued to have consensual sex. The court asked Muigai's counsel about Neal's digital medical records where "the diagnosis was sexual assault of an adult." Report of Proceedings (RP) at 17. Counsel disagreed that the chart reflected an actual medical diagnosis and reflected only what Neal reported to the provider. Muigai also continued to assert that the pictured "camera" was a "phone jack." RP at 13.

During the oral articulation of its findings, the trial court noted that determining credibility was very difficult and neutral observations were helpful. The court continued:

> We have some limited information on that here. Again, it's the MyChart. *Again, I appreciate counsel's argument that it was a report, but it's a summary and it summarizes the diagnosis, not what was reported. And there's—the fact that there was a recantation of a report to law enforcement is actually very common and doesn't necessarily carry the day.*
> When you boil down to credibility—and I appreciate that both sides are very passionate in their arguments, but *I'm actually familiar with that camera model.* And I would encourage, if somebody thinks it's a phone jack, that maybe they look at an image of it. *Because I double-checked to make sure I wasn't mistaken, and it looks exactly what's in the picture. So you've got some credibility issues that go against Mr.* [*Muigai*].
> . . . .
> . . . There's some credibility issues. *The whole machete, it's a gardening implement that he keeps on his stand, that sort of strains credibility* . . . .

11

So when I have two different versions of what happened and I've got some credibility issues on Mr. Muigai's part, that makes it difficult to put a lot of stock into what he said on a he said/she said.

So in this particular situation, I am going to grant the revision. RCW 7.105.10—excuse me—.225 says the Court shall issue if the Court finds by a preponderance of the evidence that the petitioner has been subjected to domestic violence. And in that particular situation, it tells the Court things it can't consider, and that one of them in [RCW 7.105.225](2)(b) is that the petitioner did not report the conduct giving rise to the petition to law enforcement. That goes for the second one, but also the recantation, which is entirely consistent.

I am also mindful—and the domestic violence definition in [former RCW 7.105.010(9)(a) (2022)] means either nonconsensual sexual contact or penetration, the infliction of fear of physical harm, which I think with the machete or whatever sharp object is on the nightstand.

. . . .

. . . [T]hat the statutory definition of domestic violence has been met by a preponderance of the evidence, and the law requires that I shall issue on that.

In addition to that, I do believe that the preponderance of the evidence shows coercive control that unreasonably interferes with the free will and liberty.

I agree with the narrative that has been put forth in the petitioner's declaration, and with the text changing from being very explicit to code once she got here and that it wasn't as advertised.

RP at 21-24 (emphasis added). The court granted Neal's revision and entered a

one-year DVPO against Muigai.

Muigai timely appealed to this court. The DVPO expired while this appeal was

pending.

ANALYSIS

I.    MOOTNESS

As an initial matter, Neal urges us to dismiss Muigai's appeal as moot because the DVPO has expired. Muigai contends his appeal is not moot because this court can still provide effective relief. We agree with Muigai.

An appeal is moot when the court hearing the appeal "can no longer provide effective relief." *Orwick v. City of Seattle*, 103 Wn.2d 249, 253, 692 P.2d 793 (1984). "Effective relief" can include cleansing a person's record and reputation of the "continuing stigma" of a protection order. *Hough v. Stockbridge*, 113 Wn. App. 532, 537, 54 P.3d 192 (2002), *rev'd on other grounds*, 150 Wn.2d 234, 76 P.3d 216 (2003). Here, Muigai asserts the court can still provide effective relief because he runs an in-home facility for vulnerable adults and false findings of abuse damage his reputation and directly impact his livelihood.

When a court issues a DVPO, it makes explicit findings that domestic violence occurred. RCW 7.105.225(1)(a). "Domestic violence" includes physical harm, bodily injury, and assault. Former RCW 7.105.010(9)(a) (2022), *renumbered as* RCW 7.105.010(10)(a) (LAWS OF 2024, ch. 298, § 9, effective July 1, 2025). An adult family home license may be denied if there is evidence the applicant "lacks the

13

appropriate character, competence, and suitability to provide care or services to vulnerable adults." WAC 388-76-10125(26). Further, in a nursing home license application, the Department of Social and Health Services will review any domestic violence finding resulting from a civil adjudication proceeding. WAC 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(4)(f). A domestic violence finding therefore may have lasting consequences for those who run an in-home facility for vulnerable adults. "[S]uch orders, if wrongfully issued, often have collateral consequences that extend beyond the orders' duration." *Ugolini v. Ugolini*, 11 Wn. App. 2d 443, 449, 453 P.3d 1027 (2019).

Because a domestic violence finding may impact Muigai's livelihood, we can still provide effective relief and will address the merits of his appeal.

II.    PURPORTED ERRORS

*Standard of review*

We "review a trial court's decision to grant or deny a protection order for abuse of discretion." *DeSean v. Sanger*, 2 Wn.3d 329, 334, 536 P.3d 191 (2023). A trial court abuses its discretion when its decision is manifestly unreasonable, based on untenable grounds, or based on an untenable basis. *In re Marriage of Chandola*, 180 Wn.2d 632, 642, 327 P.3d 644 (2014). An abuse of discretion occurs if the trial court relies on unsupported facts, takes an unreasonable view, applies the wrong legal standard, or bases

its ruling on an erroneous interpretation of the law. *Gildon v. Simon Prop. Grp., Inc.*, 158

Wn.2d 483, 494, 145 P.3d 1196 (2006). A reviewing court will not find an abuse of

discretion unless convinced that no reasonable person would agree with the trial court's

decision. *State v. Perez-Cervantes*, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000). We defer

to the trier of fact on witness credibility, conflicting testimony, and evidence

persuasiveness. *In re Vulnerable Adult Petition for Knight*, 178 Wn. App. 929, 936-37,

317 P.3d 1068 (2014).

### A. Determinations of Muigai's lack of credibility

The trial court found Neal's account more credible than Muigai's because it was

familiar with the device in the photo and recognized it as a camera. The court also

believed that a digital medical record summarizing a "diagnosis" of sexual assault

strengthened Neal's version of events. Based on those two things, the court granted the

revision and entered the protection order because it believed Neal proved she was

subjected to domestic violence by a preponderance of the evidence. In its oral ruling, the

court noted the statute "tells the Court things it can't consider, and that one of them . . . is

that the petitioner did not report the conduct giving rise to the petition to law

enforcement." RP at 22-23. The court believed this applied to Neal's second alleged

unreported sexual assault and her recantation.

15

Muigai assigns four errors to the trial court's credibility determinations: (1) the court evaluated his credibility based on its own personal experience of what a camera looks like, (2) Neal's medical records did not reflect an actual sexual assault diagnosis, (3) it misinterpreted RCW 7.105.225(2)(b) to mean it could not consider Neal's recantation to evaluate her credibility, and (4) it failed to properly assess Neal's credibility. We address each argument in turn.

### 1. The court's camera comments

Muigai argues the trial court violated ER 605 by using its own testimony of what a camera looks like. Neal responds that the court was merely taking judicial notice of an easily verifiable fact. We disagree with both parties.

Neal submitted a photo of the alleged camera in Muigai's living room, along with the make and model of the camera in her declarations and claimed that Muigai was spying on her. Muigai claimed the photo showed a phone jack. The trial court stated it was familiar with the camera model and it "double-checked" to make sure it was not mistaken. RP at 22. The court therefore determined the item pictured was a camera. This caused the court to conclude Muigai was not credible, which led it to accept Neal's version of the events.

Under ER 605, a "judge presiding at the trial may not testify in that trial as a witness." Civil protection order hearings are not generally bound by the rules of evidence except for privileges—ER 412, ER 413, and RCW 9A.44.020—none of which apply here. RCW 7.105.200(8). However, RCW 7.105.200(5), which governs civil protection order hearing procedure, does place some evidentiary limits on judges. RCW 7.105.200(5) states that "[h]earings may be conducted upon the information provided in the sworn petition, live testimony of the parties should they choose to testify, and any additional sworn declarations." RCW 7.105.200(5)'s plain language therefore indicates that the court should limit its consideration of evidence to the listed items.

As noted previously, we do not believe the trial court took judicial notice that the photo depicted a camera. Under ER 201(b), a judicially noticed fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The photo seems to show a camera rather than a phone jack; but frankly, persons who are familiar with the particular camera model described in the declaration would know better. What the photo depicts is not so certain that we can declare it is capable of accurate and ready determination.

17

"Judges are not blank slates operating outside of their life experiences." *State v. N.B.*, 7 Wn. App. 2d 831, 836, 436 P.3d 358 (2019). Nor do they "leave their common experience and common sense outside the courtroom door." *In re Est. of Hayes*, 185 Wn. App. 567, 598, 342 P.3d 1161 (2015); *see also State v. Grayson*, 154 Wn.2d 333, 339, 111 P.3d 1183 (2005). The court's comments reflect that it used its own life experience to determine that the photo depicted a camera rather than a phone jack. Similarly, a court might look at a photo of a fruit tree and, because of the leaves, determine the tree is likely a pear tree rather than an apple tree. Although not everyone would know the difference between apple tree leaves and pear tree leaves, those familiar with such trees could tell the difference, and the law permits a trier of fact to use their own life experiences to determine what a photo depicts.

Our decision would be different had the trial court indicated it did not know what the photo showed and *then* did its own research. But that was not the case. Here, the trial court *did* know what the photo depicted. The fact that it went to an outside source to "double-check" what it already knew did not prejudice Muigai. Had the trial court not double-checked, it still would have found Muigai untruthful about what the photo depicted.

## 2. Diagnosis of "sexual assault"

Muigai argues the trial court erred when it relied on the diagnosis of "sexual assault" in Neal's medical records. He raises several arguments why the diagnosis section should be construed as reflecting only Neals' unreliable reporting, rather than an objective medical assessment.

It is unclear what the medical diagnosis truly reflects. But the trial court believed that the medical record reflected a neutral third person's assessment. The court explained, "I appreciate counsel's argument that it was a report, but it's a summary and it summarizes the diagnosis, not what was reported." RP at 21.

We cannot say that the trial court's interpretation of the medical report was an abuse of discretion. Regardless, the court described the diagnosis as providing "limited information" from a neutral third person. RP at 21. The trial court's own assessment of this evidence reflects that it placed limited weight on the report's diagnosis of "sexual assault."

## 3. RCW 7.105.225(2)(b)

Muigai contends the trial court erred because it incorrectly interpreted RCW 7.105.225(2)(b). We conclude that if the trial court misconstrued the statute, its error was harmless.

RCW 7.105.225(2) provides six grounds on which a trial court "may not deny or dismiss a petition for a protection order," including that "[t]he petitioner did not report the conduct giving rise to the petition to law enforcement."

Here, the trial court stated that it was going to grant the revision and then noted that it could issue a protection order under RCW 7.105.225 if it found by the preponderance of evidence that the petitioner had been subjected to domestic violence. It then stated, "in that particular situation, it tells the Court things that it can't consider, and that one of them in [RCW 7.105.225](2)(b) is that the petitioner did not report the conduct giving rise to the petition to law enforcement. That goes for the second one, but also the recantation." RP at 22-23.

Muigai argues the trial court interpreted RCW 7.105.225(2)(b) to mean that it could not consider Neal's recantation when assessing her credibility. On its surface, the trial court appears to have said this. If so, its construction of RCW 7.105.225(2)(b) is erroneous. We agree with Muigai that recantation *can* serve as an inconsistent statement to cause a trier of fact to disbelieve the witness.

But earlier in its decision, the trial court expressly addressed Neal's recantation and explained why it did not place much weight on it: "the fact that there was a recantation of a report to law enforcement is actually very common and doesn't

20

necessarily carry the day." RP at 21-22. This shows that the trial court did consider whether to question Neal's credibility because she recanted and decided to give Neal's recantation limited weight.

Neal's recantation was understandable. She explained that she did not want to become homeless. Also, as implied by the trial court's statement, abused persons often recant and this does not mean their original statement was false.

More importantly, we doubt the trial court's erroneous application of RCW 7.105.225(2)(b) affected its decision. It had already arrived at its decision before it made its erroneous comment. The trial court decided to revise and grant Neal a DVPO because it believed Muigai made two objective misrepresentations—that the machete he kept on his stand was a garden implement, and the photo of the camera was instead a phone jack.

### B. Failure to assess Neal's credibility

Muigai also argues that the trial court erred when it did not assess Neal's credibility. He cites no authority that requires a court to assess both parties' credibility. An appellant waives an assignment of error if their brief does not include authority to support its contention. *Smith v. King*, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986). Relatedly, Muigai invites us to assess Neal's credibility. We decline the invitation. An

appellate court does not assess a witness's credibility.  *Strauss v. Premera Blue Cross*,

194 Wn.2d 296, 302, 449 P.3d 640 (2019) ("The credit to be given to any witness's

testimony . . . is quintessentially a matter for the trier of fact to determine.").

### C.      *Sufficiency of the evidence to support the DVPO*

Muigai argues the trial court failed to make sufficient findings and that its findings

do not support its legal conclusions.  He focuses on three alleged errors.  First, he argues

the trial court erred because it made no factual findings regarding nonconsensual sexual

conduct or nonconsensual sexual penetration between the parties.  Second, he argues the

court failed to make any findings that he engaged in domestic violence based on the

infliction of fear of physical harm.  Third, he argues the court made insufficient findings

to support its conclusion that he engaged in domestic violence based on coercive control.

We decline to require trial courts to issue detailed oral rulings or written findings

of fact and conclusions of law when issuing protection orders.  We acknowledge that

courts oftentimes have several protection order hearings in one morning or one afternoon,

and that parties often represent themselves in such hearings.  What we require instead is a

reasoned decision so we can understand the basis for the trial court's order.

In this regard, *In re Detention of LaBelle*, provides guidance:

Generally, where findings are required, they must be sufficiently specific to permit meaningful review. While the degree of particularity required in findings of fact depends on the circumstances of the particular case, they should at least be sufficient to indicate the factual bases for the ultimate conclusions. The purpose of the requirement of findings and conclusions is to insure the trial judge "has dealt fully and properly with all the issues in the case . . . so that the parties involved and this court on appeal may be fully informed as to the bases of [the] decision when it is made." However, a trial court is not required to make findings of fact on all matters about which there is evidence in the record; only those which establish the existence or nonexistence of determinative factual matters need be made.

. . . [Where written findings are inadequate], we think it appropriate . . . to look to the entire record, including the trial courts' oral decision[ ], in order to determine the sufficiency of the evidence supporting the trial courts' ultimate findings.

107 Wn.2d 196, 218-19, 728 P.2d 138 (1986) (internal quotation marks and citations omitted).

With these standards in mind, we first look at what the trial court was required to find to enter a DVPO, and we then discuss the appropriate standard of review. We next examine the trial court's oral ruling and then determine whether the court's findings sufficiently support its conclusion that domestic violence was proved.

1.   *Necessary findings*

A court "shall issue" a DVPO "if it finds by a preponderance of the evidence" that "the petitioner has been subjected to domestic violence by the respondent."

23

RCW 7.105.225(1)(a).  A person is subjected to domestic violence if they experience the fear of physical harm, nonconsensual sexual conduct or nonconsensual sexual penetration, or coercive control.  Former RCW 7.105.010(9)(a).

2.      *Standard of review*

We review a trial court's findings of fact for substantial evidence.  *Knight*, 178 Wn. App. at 936-37.  Evidence is substantial when it is sufficient to persuade a fair-minded person of the truth of the matter asserted.  *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017).  "[C]ompetent evidence sufficient to support the trial court's decision to grant . . . a domestic violence protection order may contain hearsay or be wholly documentary."  *Blackmon v. Blackmon*, 155 Wn. App. 715, 722, 230 P.3d 233 (2010) (citing *Gourley v. Gourley*, 158 Wn.2d 460, 467, 145 P.3d 1185 (2006)).  We review questions of law de novo.  *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003).

3.      *The trial court's oral decision*

*Nonconsensual sexual contact or penetration*

When the trial court began to articulate its decision, it mentioned nonconsensual sexual contact before it proceeded to address the rest of the statute.  Based on the court's oral ruling, we cannot determine if it granted a DVPO based on nonconsensual sexual

contact or penetration. We therefore agree with Muigai that the court failed to make sufficient findings that nonconsensual sexual contact or penetration occurred.

*Infliction of fear of physical harm*

The trial court then found that Neal had proved domestic violence because Muigai threatened her with a machete, causing her to fear physical harm. The court decided that Neal's version of events was more credible than Muigai's. Neal claimed that Muigai had threatened to harm her with his machete if she pursued criminal charges against him. A fair-minded person could determine that Muigai inflicted fear of physical harm on Neal. We conclude that substantial evidence supports the trial court's conclusion that Muigai engaged in domestic violence.

*Coercive control*

"Coercive control" is "a pattern of behavior that is used to cause another to suffer physical, emotional, or psychological harm, and in purpose or effect unreasonably interferes with a person's free will and personal liberty." RCW 7.105.010(4)(a). "In determining whether the interference is unreasonable, the court shall consider the context and impact of the pattern of behavior from the perspective of a similarly situated person." RCW 7.105.010(4)(a).

The court also found that Neal had proved coercive control. It "agree[d] with the narrative that ha[d] been put forth in [Neal's] declaration." RP at 24. Competent evidence exists to establish that Muigai coercively controlled Neal. Neal claimed that Muigai pressured her to move and, once she was in Spokane and had no job or possessions and was completely isolated, the tenor of their relationship changed. After that occurred, she felt she had to stay even though Muigai sexually assaulted her and frequently pressured her for sex because she did not want to become homeless. A similarly situated person under the same circumstances would feel their personal liberty was interfered with.

Muigai argues he did not coercively control Neal because he paid her $52,000 per year for her work and she was free to go as she pleased. He also argues he did not coercively control her because she had her own bedroom, she brought her daughters to Spokane, found different employment, and refused to stay in a hotel on the night of the alleged rape.

We acknowledge that the dynamic of Muigai and Neal's relationship changed as he started paying her and she became less financially dependent on Muigai. However, for the first couple of months that Neal lived in Spokane, a fair-minded person could be persuaded that Muigai interfered with her free will and liberty.

26

We conclude that the court did not abuse its discretion when it granted the DVPO based on infliction of fear of physical harm and coercive control.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____          _____
Staab, C.J.                                                    Murphy, J.